**SUNRAY DX OIL COMPANY, a Corporation, Plaintiff in Error,**

v.

**Everett CREWS and Helen Crews, Defendants in Error.**

**No. 41251.**

Supreme Court of Oklahoma.

Dec. 23, 1968.

M. Darwin Kirk, J. P. Greve, John F. Curran, Tulsa, for plaintiff in error.

Charles G. Huddleston, of Otjen, Carter, Huddleston & Otjen, Enid, for defendants in error.

WILLIAMS, Justice.

This is an appeal from a judgment of the court below in an action brought by plaintiffs to establish a breach by defendant of an alleged implied covenant arising from an oil and gas lease. On appeal, the parties will be referred to as they appeared below, i. e. defendants in error will be referred to as plaintiffs and plaintiff in error will be referred to as defendant.

Plaintiffs herein are the owners of the Northwest Quarter of Section 7, Township 20 North, Range 5 West, Garfield County, Oklahoma. In 1953, defendant, Sunray DX Oil Company, acquired an oil and gas lease covering the described property. Sometime subsequent to the acquisition of the lease and prior to the expiration of its primary term, defendant drilled the Crews No. 1 well in the SE/4 and the Crews No. 2 well in the NW/4 of the described property. Both wells were drilled in accordance with the 80-acre spacing pattern applicable to the field in which they are located. The two wells were completed in the Oswego Lime formation and, at time of trial, both were capable of producing their oil allowables.

Subsequent to the drilling and completion of the two wells on plaintiffs' property, other wells, all on an 80-acre spacing pattern, were drilled and completed in the Oswego Lime formation on surrounding leases. In the SE/4 NW/4 of Section 6, Township 20 North, Range 5 West, Magness Petroleum Company ("Magness") completed as a producer its Beard No. 1 well. In the SE/4 SW/4 of the same Section 6, Champlin Oil and Refining Company ("Champlin") completed a producer, its Moore No. 1 well. Shell Oil Company ("Shell") completed as producers its Stutz No. 1 well in the SE/4 SE/4 of Section 1, Township 20 North, Range 6 West, and its Brooks No. 1 well in the SE/4 NE/4 of Section 12, Township 20 North, Range 6 West. Champlin's Moore No. 1 and Shell's Stutz No. 1 and Brooks No. 1, were offset locations to the two wells drilled by defendant on plaintiffs' property.

In July, 1963, plaintiffs received information that Champlin had submitted to the royalty owners of the Moore No. 1 well and the Beard No. 1 well a contract which proposed to forego the drilling of the second permitted well in each quarter section in which the two completed wells respectively were located, to attribute this acreage to such completed wells, and to produce each well at 180% of the allowable applicable to wells drilled on an 80-acre spacing pattern. Plaintiffs conveyed this information to defendant by letter and therein requested a

reply advising them of defendant's attitude toward such contract and of defendant's intentions in regard to preventing the alleged drainage which would occur from plaintiffs' property if the contract were approved. In this letter, plaintiffs also stated that they would expect the allowable of their Crews No. 2 well to be equal to the allowable of the Moore No. 1 well which was located on the immediately offsetting location.

Defendant, Sunray DX, answered plaintiffs' letter by stating that if Champlin did not drill a second well in the quarter section in which its No. 1 Moore was located, and if Champlin complied with the rules of the Oklahoma Corporation Commission in obtaining a 180% allowable for such well, then * * *. "there is nothing that Sunray can do to reduce their [Champlin's] allowable or to increase the allowable on our No. 2 Crews."

After this initial correspondence, plaintiffs and defendant exchanged other letters in summary, plaintiffs advised defendant of the applications filed with the Corporation Commission requesting 180% allowables for certain wells in Sections 5 and 6, Township 20 North, Range 5 West, and in Section 1 and the east half of Section 12, Township 20 North, Range 6 West; of the facts which plaintiffs believed to establish that drainage would occur to their property if the offsetting leases were granted 180% allowables; and, of plaintiffs' intention to press a claim against defendant lessor for damages to their property unless defendant resisted the applications for 180% allowables filed with the Corporation Commission.

In reply to plaintiffs' correspondence defendant stated its belief that one well in a quarter section (160 acres) would have a much greater rate of decline than the two wells located on plaintiffs' property; that the combined allowable of plaintiffs' two wells would be higher than a 180% allowable for one well completed on a quarter section; and, that defendant's operation of two wells on plaintiffs' property afforded the maximum recovery of oil and fully protected the lease from offset drainage.

After defendant's apparent refusal to resist the applications filed with the Corporation Commission for 180% allowables from wells surrounding plaintiffs' property, plaintiffs retained an attorney and an engineer and appeared before the Corporation Commission to resist the application filed in Cause CD No. 18630, wherein Magness was seeking to obtain 180% allowables from its Anderson No. 1 and Beard No. 1 wells, and the application filed in Cause CD No. 19088, wherein Champlin was seeking to obtain a 180% allowable from its Moore No. 1 well. At the conclusion of the proceedings in each of these causes the Corporation Commission entered its order granting the increased allowables.

Plaintiffs herein appealed the above order of the Corporation Commission granting Champlin's application in Cause CD No. 19088, and this Court affirmed such order. See Crews v. Champlin Oil and Refining Co., Okl., 413 P.2d 508.

Subsequent to the proceedings and the order entered therein by the Corporation Commission relative to the Champlin and Magness applications, plaintiffs filed their petition initiating the action below. In their petition, plaintiffs recited the proceedings previously had before the Corporation Commission, and further stated that Shell presently had pending before the Corporation Commission, in Cause No. CD 19582, an application to produce 180% of allowable from its Brooks No. 1 Well, located as previously stated herein in the SE/4 NE/4 of Section 12, Township 20 North, Range 6 West, and, in Cause CD No. 19583, an application to produce 180% of allowable from its Stutz No. 1 well located in the SE/4 SE/4 of Section 1, Township 20 North, Range 6 West. Both of these wells were drilled on the immediately offsetting locations to plaintiffs' No. 2 well. Plaintiffs alleged in their petition that if Champlin's Moore No. 1, Magness's Beard No. 1, and Shell's Stutz No. 1 and Brooks No. 1

produced 180% allowables, there would be uncompensated drainage of the hydrocarbons underlying plaintiffs' land. Plaintiffs further alleged that defendant's refusal to furnish assistance to plaintiffs in defending before the Corporation Commission the applications of Champlin and Magness and its refusal to furnish assistance in defending the then pending applications of Shell constituted a breach of the implied covenants contained in the oil and gas lease covering plaintiffs' land.

As a result of this alleged breach of the implied covenants, plaintiffs sought below to cancel the oil and gas lease or, in the alternative, to require defendant to pay all costs, attorney fees, engineering expenses and to furnish full and complete cooperation in the defense of the Champlin, Magness and Shell applications filed with the Corporation Commission. In their second cause of action, plaintiffs sought damages in the amount of $4,000 for expenses allegedly paid in defense of such applications and in the amount of $5,000 for drainage which allegedly had occurred to their land.

It should be noted herein that plaintiffs originally joined both Shell and Continental Oil Company as defendants below but they were dismissed from the action prior to the entry of lower court's judgment.

At trial, plaintiffs adduced expert testimony of a petroleum engineer to the effect that under several theories of drainage, if the Moore, Beard, Brooks and Stutz wells were produced at 180% allowable, there would be uncompensated drainage of hydrocarbons from plaintiffs' land. This expert further testified that based upon his opinion of the location of the water-oil contact line, it was highly unlikely that the west half of either the Shell Stutz lease or the Shell Brooks lease contained any productive hydrocarbons and, therefore, the wells located on the east half of such leases would not be entitled under the rules and regulations of the Corporation Commission to produce 180% of their allowables.

Everett J. Crews, one of the plaintiffs herein, testified that he had made demand upon defendant to protest the applications filed with the Corporation Commission by Champlin, Magness and Shell, but upon its refusal he had retained an attorney and an engineer and had already incurred approximately $3900 in expenses in the protest of these applications. Witness further testified that in a conference with an employee of defendant, a Mr. Sutherland, he was advised that it was against defendant's policy to protest applications for 180% allowables.

Defendant submitted testimony of two expert witnesses, a petroleum engineer and a geologist, to the effect that the granting of 180% allowables to the Stutz, Brooks, and Moore leases would not result in uncompensated drainage to plaintiffs' property; that the plaintiffs' wells, assuming they produce the basic allowable, will drain more acreage and acre feet than will the surrounding wells even if the latter are producing 180% allowables; that the water-oil contact line was to the west of the Shell, Stutz and Brooks leases and that the entire acreage of such leases (with the possible exception of the extreme southwest portion of the Brooks lease) was productive of hydrocarbons; and, that of the 37 quarter sections in the Flynn Field (which includes all of the leases involved herein), applications for 180% allowables had been granted on twelve and applications for 180% allowables were presently pending on four other quarter sections.

Mr. John W. Sutherland, Jr., Division Manager of defendant, testified that he did have a conversation with plaintiff, Everett J. Crews, concerning the application of Champlin and Magness but that he had not advised this plaintiff that it was the policy of defendant not to protest applications for 180% allowables. He further testified that he had conferred with another of defendant's employees prior to his meeting with Mr. Crews, and that they had concluded the applications for 180% allowables would not be harmful to plaintiffs' property.

In rebuttal to the testimony of defendant's expert witnesses, plaintiffs introduced the testimony of a geologist. This witness

testified that based upon an exhibit he had prepared showing the contour lines drawn on the top of the Oswego Lime formation, the water-oil contact line was located in the Southeast Quarter and west half of the Stutz lease and in the east half of the Brooks lease. This witness also testified that he would not recommend the drilling of any well on the west half of such leases.

It should be noted that the record herein discloses that at conferences prior to the trial below, plaintiffs and defendant exchanged information and their interpretation of the facts in an attempt to resolve their differences. However, these conferences were unsuccessful.

At the close of the trial below, the trial judge, in an oral pronouncement from the bench, granted judgment for plaintiffs on their first cause of action, which, in effect, required defendant to appear before the Corporation Commission and defend the applications filed by Shell requesting 180% allowables on its Stutz and Brooks wells. Thereupon, defendant's counsel made the following remarks to the court:

> "There is one thing I can't understand. I can't understand how we can help Crews. I don't see how our testimony can be of any assistance. It is bound to be detrimental. What in the world can we do to help them?"

At the conclusion of these remarks, the trial judge then orally granted judgment for plaintiffs in the amount of $3395.27, which amount represented the expenses theretofore incurred by plaintiffs in defense of the various applications.

In its written findings of fact, the trial court found, inter alia that the west halves of the Shell-Brooks and Shell-Stutz leases were not underlain by productive hydrocarbons and that the plaintiffs' property would suffer uncompensated drainage if the adjacent wells were allowed to produce 180% of their allowables. The trial court concluded as a matter of law, that the implied covenants of the oil and gas lease between plaintiffs and defendant required defendant lessee to represent plaintiffs in protesting the applications for increased allowables filed by Champlin, Magness and Shell with the Corporation Commission. The court then entered its judgment requiring defendant to defend the then pending Shell applications and granting plaintiffs the sum of $3395.27 for expenses incurred in defending the applications to date.

From this judgment of the trial court and its order overruling motion for new trial, defendant appeals.

As is clear from the record and the briefs of the parties herein, the action below was initiated by plaintiffs on the theory that an oil and gas lease contains an implied covenant requiring the lessee (defendant herein) to represent the lessor (plaintiffs) in proceedings before a regulatory agency. As the parties hereto recognize, if this Court were to hold that such an implied covenant is contained in an oil and gas lease, it would be necessary also to consider the scope of the duties imposed upon a lessee by such implied covenant and to determine whether defendant herein had discharged the duties so imposed.

The suggestion that an oil and gas lease contains an implied covenant requiring a lessee to appear in a proceeding before a regulatory agency in an attempt to obtain orders favorable both to the lessor and lessee in the development and operation of a lease was apparently initially made by Prof. Merrill. See Merrill, Current Problems in the Laws of Implied Covenants in Oil and Gas Lease, 23 Tex.L.Rev. 137, 140 (1945). Since this initial suggestion, Prof. Merrill has written on other occasions of the existence of such an implied covenant and of the scope of its application. See Merrill, Fulfilling Implied Covenant Obligations Administratively, 9 Okl. L.R. 125 (1956); Merrill Covenants Implied in Oil and Gas Leases § 228 (Supp.1964).

Although we are not aware of any decisions of this Court wherein we have expressed an opinion as to Prof. Merrill's suggestion, several writers in the field of oil and gas law have disagreed with his contentions. See, e. g. Conn, Trends in the

Application of the Implied Covenant of Further Development, 12 Okl.L.R. 470, 485 (1959); and Eberhardt, Effect of Conservation Laws, Rules and Regulations on Rights of Lessors, Lessees and Owners of Unleased Mineral Interests, 5 S.W. Legal Foundation Institute on Oil and Gas Law and Taxation 125, 151 (1954).

In Sinclair Oil and Gas Co. v. Bishop, Okl., 441 P.2d 436, a lessor was seeking the cancellation of an oil and gas lease upon several grounds, one of which was that the lessee had failed to complete a well in the manner of a reasonably prudent operator. In summarizing the evidence submitted in regard to the completion of the well, (at 441 P.2d 445) we stated:

> " * * * The evidence on the part of lessors at most showed there might have been a better method of completion. The probative value of lessees' evidence does establish that Woods did complete the well according to the judgment of its experts."

We continued by stating:

> "We determine that in the completion of this well Woods was within its prerogatives by acting in reliance upon its own experts. Upon this basis it must be concluded such judgment prevails over the lessors' claim that the well was improperly completed."

In our opinion this statement is applicable to this appeal herein.

■ From our earlier recitation of the facts herein, it is clear that there was a disagreement between the expert witnesses of plaintiffs and defendant as to the question of whether the granting of 180% allowables to offsetting wells would result in uncompensated drainage to plaintiffs' property. It is equally clear that defendant, although it had reviewed plaintiffs' theories of drainage prior to the trial below, chose to rely on its own experts in regard to whether the 180% allowables would result in damage to the lease in question.

As also stated earlier herein, this State's Corporation Commission, after hearings, had granted, prior to the trial of the action below, the applications of Champlin and Magness for 180% allowables from wells offsetting plaintiffs' property. As noted, this Court reviewed the proceeding in which Champlin was granted the increased allowable from its Moore No. 1 well and affirmed the Corporation Commission.

If defendant herein did in good faith rely on the judgment of its experts in regard to the application for increased allowables, the judgment of the court below places it in somewhat of a dilemma. If it had appeared before the Corporation Commission to defend or help defend against the Shell applications, as it was ordered to do, it would have had either to submit evidence detrimental to plaintiffs' position or to commit or condone perjury. The only relief we could grant plaintiffs alternative to requiring defendant to so defend the applications would be to affirm the trial court's judgment requiring defendant to reimburse plaintiffs for subject expenses. We decline to follow either of such alternatives.

In our opinion, the case at bar can be determined without our deciding the validity of the implied covenant suggested by Prof. Merrill or without our deciding whether such implied covenant, if we were to assume that such did arise from the provisions of an oil and gas lease, would require a lessee to appear before a regulatory agency to protest applications concerning other oil and gas leases adjacent to that operated by the lessee upon whom this burden was sought to be placed. Our determination of the matters herein involved precludes our reaching the question of whether defendant had an obligation to plaintiffs to comply with an alleged implied covenant in subject lease.

■ Rather, after a careful consideration of all the facts, circumstances and evidence in this record and the contentions of the parties, we are of the view that defendant's reliance on the judgment of its own experts in determining to present no defense (on behalf of its lessors) against applications filed with the Oklahoma Corporation Commission for increased oil allow-

ables from the adjacent oil and gas leases surrounding the lease operated by such lessee was reasonable under the circumstances of this case and, the lessors having failed in their own efforts in such behalf, that the order of the trial court, based upon the theory of implied covenants so to do, requiring defendant to furnish representation to plaintiff lessors in future hearings on such applications and to reimburse lessors for past expenses in litigating some of such applications, being clearly against the weight of the evidence, should be reversed.

Judgment of the court below is reversed and cause remanded thereto with directions to proceed in a manner not inconsistent with the view herein expressed.

Reversed.

WILLIAMS, BERRY, HODGES, LAVENDER and McINERNEY, JJ., concur.

JACKSON, C. J., IRWIN, V. C. J., and DAVISON and BLACKBIRD, JJ., concur in result.