64 F.3d 1481
 Ruth FRANSEN, Martha Harms, Elsie Hinz, Wilson Mahone, Mary
Gene McCoy, Tim Ruyle, Brenda K. Ruyle, Jeanette Stone, Jack
Stone, Cassandra Gibbons, Woody Dean Gibbons, Del Gordon
d/b/a G.M. Properties, and Orman E. McCartney, Jr., and
Rosaline O. McCartney, Trustees Under the McCartney Family
Trust as Amended and Restated April 17, 1986, Plaintiffs-Appellants,
Kirkland Royalty, Inc., Additional Plaintiff,
v.
CONOCO, INC. (formerly Continental Oil Company), and C.I.G.
Exploration, Inc., Defendants-Appellees.
 Nos. 94-6234, 94-6268.
 United States Court of Appeals,
Tenth Circuit.
 Aug. 30, 1995.
 
 1
 Michael J. Rovell (Lisa I. Fair with him on the brief) of Law Offices of Michael J. Rovell, Chicago, IL, for plaintiffs-appellants.
 
 
 2
 Gary W. Davis of Crowe & Dunlevy, Oklahoma City, OK (Mark D. Christiansen of Crowe & Dunlevy, Oklahoma City, OK, and Russell D. Howell of Conoco, Inc., Houston, TX, with him on the brief), for defendant-appellee Conoco, Inc.
 
 
 3
 Donna N. Blakley of Hall, Estill, Hardwick, Gable, Golden & Nelson, Oklahoma City, OK (Sharon Taylor Thomas of Hall, Estill, Hardwick, Gable, Golden & Nelson, Oklahoma City, OK, and Bruce Wolitarsky of C.I.G. Exploration, Inc., Houston, TX, with her on the brief), for defendant-appellee C.I.G. Exploration, Inc.
 
 
 4
 Charles B. Davis, Oklahoma City, OK, filed a brief for amicus curiae Association of Land and Mineral Owners.
 
 
 5
 Before EBEL, Circuit Judge, McWILLIAMS, Senior Circuit Judge, and JENKINS, Senior District Judge.*
 
 
 6
 JENKINS, Senior District Judge.
 
 
 7
 The plaintiffs own mineral interests in certain property in Oklahoma. They brought this diversity action against their lessees, Conoco, Inc., and C.I.G. Exploration, Inc. (CIGE), alleging that the lessees had failed to protect and develop their interests. The district court held that a prior decision of the Oklahoma Corporation Commission barred the plaintiffs' claims. We affirm.
 
 I.
 
 8
 The plaintiffs own undivided interests in the oil and gas underlying section 14, Township 12 North, Range 16 West, Custer County, Oklahoma. Section 14 is a drilling and spacing unit for production of gas from the Des Moines common source of supply. Plaintiffs Ruth Fransen, Martha Harms, Elsie Hinz, Wilson Mahone, Mary Gene McCoy and Orman E. McCartney, Jr. and Rosaline O. McCartney, trustees under the McCartney Family Trust, leased their interests to Conoco. The other plaintiffs leased their interests to CIGE. Conoco operates the Meacham No. 1-14 well, which is the unit well for section 14, and owns a 37-percent interest in its production. In early 1981, shortly after the Meacham No. 1-14 well was completed, Anson Corporation completed the Downing No. 1-15 well on adjoining section 15. Conoco owns a 29-percent interest in production from the Downing No. 1-15 well; CIGE has no interest in the Downing No. 1-15 well.
 
 
 9
 The plaintiffs claim that the Downing No. 1-15 well is draining hydrocarbons from section 14. The plaintiffs brought this action claiming that the defendants breached their implied covenants under the leases to fully develop the leases, to protect them from drainage and to take whatever administrative or judicial action was necessary to protect section 14 from drainage. The plaintiffs claimed that the defendants breached their obligation to act as a prudent operator by failing to drill an additional well in section 14. The plaintiffs also claimed that Conoco breached the fiduciary duty it owed the plaintiffs as operator for the section 14 unit. The plaintiffs claimed that Conoco's actions in fostering the completion of the Downing No. 1-15 well caused fraudulent drainage of section 14 and were tortious, wanton and malicious, subjecting Conoco to punitive as well as compensatory damages. Finally, the plaintiffs claimed that the defendants were liable for unpaid royalties. The plaintiffs sought cancellation of their leases and damages.
 
 
 10
 In 1992 the Oklahoma Corporation Commission (OCC) denied an application from Great Bear Exploration, Inc. to drill an additional well in section 14. The plaintiffs and defendants were notified of the OCC proceedings. Conoco opposed the application. None of the other parties took part in the administrative proceedings. The OCC found that an additional well in section 14 was unwarranted and would violate the rights of owners in other sections of the Des Moines common source of supply. Specifically, it found that the Meacham No. 1-14 well "has and will continue to recover for the owners in Section 14 their fair share of the gas in the Des Moines common source of supply." Aplee.Supp.App. at 44. The OCC found that Conoco had acted prudently in recovering a fair share of the gas in section 14 and resisting Great Bear's application. The OCC also found that "[a]ny drainage occurring in Section 14 is compensated for through production of the No. 1-14 Meacham well. To allow an additional well to be drilled and produced in Section 14 would result in damage to the correlative rights of owners in adjacent sections." Id. at 45. The Oklahoma Court of Appeals affirmed the OCC order on appeal, and the Oklahoma Supreme Court denied certiorari. The OCC order is thus a final order.
 
 
 11
 Great Bear, the applicant before the OCC, assigned its interest in section 14 to Kirkland Royalty, Inc. The plaintiffs entered into agreements with Kirkland authorizing Kirkland to take any action on their behalf to protect their interests. Kirkland brought this action on behalf of the plaintiffs and is controlling and paying for this litigation.[1]
 
 
 12
 CIGE moved for partial summary judgment on the plaintiffs' claims for breach of their implied covenants to further develop section 14 and protect it against drainage. Conoco moved for partial summary judgment on all the plaintiffs' claims except their royalty underpayment claim. The district court granted both motions. The court concluded that, in light of the OCC's findings, the defendants' actions did not breach any implied covenant. The court reasoned that the defendants could not be liable for failing to drill an additional well in section 14 when the OCC had determined that an additional well should not be drilled. The court further held that Conoco was entitled to summary judgment on the plaintiffs' claim for breach of its fiduciary duty but concluded that, "[w]hether an award of punitive damages [against Conoco] is appropriate under any remaining theory cannot yet be determined." Aplt. App. at 278. The court also reserved the question of the defendants' liability for royalty underpayments.[2] The court certified its partial summary judgments as final judgments under Federal Rule of Civil Procedure 54(b) and denied the plaintiffs' motion to reconsider its summary judgment rulings. The plaintiffs have appealed.
 
 II.
 
 13
 This is not the first time we have considered claims by the owners of mineral interests in section 14 that Conoco failed to protect their interests. Other owners of mineral interests in section 14 brought an earlier action against Conoco's predecessor, Continental Oil Co., alleging that offsetting wells were draining oil and gas from section 14, that Conoco had failed to protect the section from drainage and that Conoco had not prudently developed the section. The case was tried to a jury, which found that Conoco had engaged in fraudulent drainage, had breached its fiduciary duty to the mineral interest owners and had failed to develop the mineral interests adequately. On appeal, this court held that the trial court erred in not giving preclusive effect to the OCC order and remanded the case with instructions to enter judgment against the plaintiffs in that action. See Ruyle v. Continental Oil Co., 44 F.3d 837 (10th Cir.1994), cert. denied, --- U.S. ----, 116 S.Ct. 272, --- L.Ed.2d ---- (1995). Conoco and CIGE argue that the plaintiffs' claims in this action are similarly barred.
 
 
 14
 Ruyle held that the plaintiffs' claims there were barred on two grounds--under the doctrine of collateral estoppel (or issue preclusion) and under an Oklahoma statute prohibiting collateral attacks on OCC orders. See 44 F.3d at 841. Under the doctrine of collateral estoppel, once a court decides an issue of law or fact that was fairly and fully litigated and necessary to its judgment, that issue may not be relitigated in a suit on a different cause of action. See Wilson v. Kane, 852 P.2d 717, 722 n. 23 (Okla.1993); Veiser v. Armstrong, 688 P.2d 796, 800 nn. 9 & 11 (Okla.1984). Collateral estoppel, however, only binds those who were parties to the first proceeding or their privies. Wilson, 852 P.2d at 722 n. 23. None of the plaintiffs in this case, unlike the plaintiffs in Ruyle, took part in the OCC proceedings, although three of the plaintiffs--Ruth Fransen, Martha Harms and Elsie Hinz--entered into agreements with Great Bear, the applicant before the OCC, authorizing Great Bear to act on their behalf to have another well drilled in section 14. See Aplee.Supp.App. at 245-65.
 
 
 15
 Ruyle suggests that the plaintiffs may have been parties to the OCC proceedings under section 87.2 of title 52 of the Oklahoma Statutes, by virtue of their ownership of mineral interests in section 14. Section 87.2 provides that "mineral owners ... within the subject area of an application or the owners of correlative rights within the common source of supply or supplies embraced within an application to the extent such owners are directly affected by such application, shall be proper parties" to protest the application or present testimony or evidence at a hearing thereon. Okla.Stat.Ann. tit. 52, Sec. 87.2 A (West 1991). See also Ruyle, 44 F.3d at 844 ("Plaintiffs, as mineral owners on the lands covered by [Great Bear's] application, were thus statutorily designated as parties" to the OCC proceedings). It is not clear whether section 87.2 automatically makes a mineral owner a party to an OCC proceeding or merely designates who may be a party to an OCC proceeding, in which case some further action would be necessary to make the potential party an actual party to the proceedings. Cf. Forest Oil Corp. v. Corporation Comm'n, 807 P.2d 774, 780 (Okla.1990) ("Section 87.2 enumerates those parties entitled to protest applications ... or to present evidence at hearings arising under or relating to those protests"). In any event, the plaintiffs in Ruyle moved to intervene in the OCC proceedings and actually appeared and took part in the proceedings through their attorney, whereas the plaintiffs here did not participate in the OCC proceedings. Thus, Ruyle is distinguishable.
 
 
 16
 The plaintiffs advance other arguments, not expressly considered in Ruyle, why collateral estoppel should not apply in this case.[3] We need not reach those arguments, however, because we conclude that whatever preclusive effect the OCC order has in this action is the same whether considered under the doctrine of collateral estoppel or under Oklahoma's statutory prohibition against collateral attacks on OCC orders. See Okla.Stat.Ann. tit. 52, Sec. 111.
 
 
 17
 Although related, the rule against collateral attacks and the common law doctrine of collateral estoppel or issue preclusion are not the same. The collateral attack doctrine can apply even where collateral estoppel does not. See Trahan v. Superior Oil Co., 700 F.2d 1004, 1019 (5th Cir.1983). In particular, a person can be barred from collaterally attacking an order entered in a proceeding to which he or she was not a party. See, e.g., Frost v. Gulf Oil Corp., 119 So.2d 759, 765 (Miss.1960); Phillips Petroleum Co. v. Corporation Comm'n, 482 P.2d 607, 610-11 (Okla.1971). Because the prohibition against collateral attacks applies to all the plaintiffs--even those who were not in privity with Great Bear (a party to the OCC proceedings)--we will analyze the plaintiffs' claims under Oklahoma's statutory proscription against collateral attacks rather than under the doctrine of collateral estoppel.
 
 
 18
 Section 111 of title 52 of the Oklahoma Statutes provides:
 
 
 19
 No collateral attack shall be allowed upon orders, rules and regulations of the [Oklahoma Corporation] Commission made hereunder, but the sole method of reviewing such orders and inquiring into and determining their validity, justness, reasonableness or correctness shall be by appeal from such orders, rules or regulations to the [Oklahoma] Supreme Court.
 
 
 20
 Okla.Stat.Ann. tit. 52, Sec. 111. "A collateral attack is an attempt to avoid, defeat, evade, or deny the force and effect of a final order or judgment in an incidental proceeding other than by appeal, writ of error, certiorari, or motion for new trial." Woods Petroleum Corp. v. Sledge, 632 P.2d 393, 396 n. 4 (Okla.1981). We believe the plaintiffs' claims would avoid, defeat or deny the force and effect of the OCC's order in this case and thus are barred as a collateral attack on that order.
 
 
 21
 Under Oklahoma law, an oil or gas lessee owes its lessor certain duties, including a duty to further develop a lease after an initial well has been drilled and to protect the lease from drainage. See Trust Co. v. Samedan Oil Corp., 192 F.2d 282, 284 (10th Cir.1951) (applying Oklahoma law); Samson Resources Co. v. Corporation Comm'n, 702 P.2d 19, 23 (Okla.1985). These duties are inherent in the lessee's implied covenant to develop the lease as a prudent operator. See Leck v. Continental Oil Co., 800 P.2d 224, 228 (Okla.1989). Similarly, a unit operator, such as Conoco, has a duty to operate the leaseholds as a unit and to safeguard the correlative rights of the various interest holders. Samson, 702 P.2d at 23. The unit operator's duty is fiduciary in nature. See Leck, 800 P.2d at 228-29.
 
 
 22
 Although the implied covenant to fully develop a lease and the implied covenant to protect against drainage are separate covenants, see Rogers v. Heston Oil Co., 735 P.2d 542, 546 (Okla.1984), to recover for a breach of either covenant, the plaintiffs must show that a prudent operator, having due regard for the interests of both the lessor and lessee, would have drilled an additional, offset well on section 14. See Gerson v. Anderson-Prichard Prod. Corp., 149 F.2d 444, 446 (10th Cir.1945); Rogers, 735 P.2d at 546-47; Haken v. Harper Oil Co., 600 P.2d 1227, 1230-31 (Okla.Ct.App.1979). To prevail on their breach of fiduciary duty claim, the plaintiffs must prove that Conoco engaged in improper operations on section 14. See Leck v. Continental Oil Co., 971 F.2d 604, 607 (10th Cir.1992); Leck, 800 P.2d at 229.
 
 
 23
 Under Oklahoma law, only one well is permitted in a spacing or drilling unit, such as section 14, unless the OCC authorizes an additional well. See Okla.Stat.Ann. tit. 52, Sec. 87.1(c) & (d) (West Supp.1995). The OCC order establishing section 14 as a drilling and spacing unit provided for only one unit well. See Aplee.Supp.App. at 11, pp 1 & 2. Oklahoma prohibits the drilling of any other well into a common source of supply after a spacing order has been entered absent permission from the OCC, see Okla.Stat.Ann. tit. 52, Sec. 87.1(d) & (e), and the OCC specifically denied permission to drill a second well in section 14. A prudent operator would not drill a well that was prohibited by law. The plaintiffs therefore could not establish an essential element of their claims for breach of the implied covenants of development and protection without avoiding, evading or denying the effect of the OCC order.
 
 
 24
 Moreover, Oklahoma recognizes that the express provisions of an oil or gas lease may negate or modify the lessee's implied covenants. See Rogers, 735 P.2d at 546. The leases in this case provided that all express and implied covenants were subject to federal and state laws, executive orders, rules and regulations and excused Conoco and CIGE from liability for failure to comply with any covenant if compliance was prevented by (or the failure to comply was the result of) any such governmental action. The OCC order denying permission to drill a second well in section 14 prevented compliance with any duty the defendants might otherwise have had to drill an offset well in section 14 and therefore excused the defendants' failure to drill such a well. See Cook v. El Paso Natural Gas Co., 560 F.2d 978, 982 (10th Cir.1977) (where government action precludes the drilling of a second well, an express or implied contractual covenant to drill such a well is excused) (applying New Mexico law); Sinclair Oil & Gas Co. v. Bishop, 441 P.2d 436, 446-47 (Okla.1967) ("the obligor under a contract is not compelled to perform under that contract terms when to do so would be contrary to law").
 
 
 25
 In short, the trial court correctly concluded that Conoco and CIGE did not breach any duty to the plaintiffs by not drilling a well they could not lawfully drill.
 
 
 26
 The plaintiffs argue that Conoco breached its independent duty as unit operator to seek OCC approval for an additional well and therefore can be liable despite the OCC order. The fact that the application the OCC denied was from Great Bear and not the defendants is irrelevant. Neither the plaintiffs nor the defendants were free to ignore the effect of the OCC order. Under Oklahoma law, the OCC could authorize an additional well only if it would help prevent waste or protect the correlative rights of those interested in the common source of supply.[4] See Okla.Stat.Ann. tit. 52, Sec. 87.1(d). The OCC expressly found that a second well on section 14 was not justified and that to allow an additional well to be drilled and produced would damage the correlative rights of owners in adjacent sections. That finding was not subject to collateral attack, see id. Sec. 111, even by the OCC itself, see Kaneb Prod. Co. v. GHK Exploration Co., 769 P.2d 1388, 1391 (Okla.1989). Thus, even if Conoco or CIGE had submitted its own application to drill a second well on section 14, the OCC would have had to deny the application, absent a substantial change in conditions or in knowledge of conditions. See Anson Corp. v. Hill, 841 P.2d 583, 586 (Okla.1992); Nilsen v. Ports of Call Oil Co., 711 P.2d 98, 102 (Okla.1985); Phillips Petroleum, 482 P.2d at 609-11.
 
 
 27
 The plaintiffs suggest that there was a sufficient change in conditions or in knowledge of conditions to justify a different result had Conoco or CIGE sought permission to drill a second well. Specifically, the plaintiffs claim that Conoco presented false data to the OCC in opposing Great Bear's application.[5] They claim that Conoco had one set of data that it used internally in making its business judgments and another set of data that it showed the OCC in opposing Great Bear's application and on which the OCC ultimately relied. The plaintiffs suggest that, if Conoco had given the OCC the more accurate data, which it withheld, the OCC would have granted permission to drill a second well.
 
 
 28
 The plaintiffs' argument is essentially that Conoco committed a fraud on the OCC. A claim that a party misrepresented facts to the OCC is properly brought before the OCC. Leck, 800 P.2d at 230. The district court lacked jurisdiction to consider such a claim of intrinsic fraud. Id. at 229-30.
 
 
 29
 The plaintiffs argue that, even if the OCC order precluded the defendants from drilling a second well on section 14, the defendants could have taken other steps to prevent or lessen the effect that the section 15 well had on section 14 and that they breached their duty to act as prudent operators by failing to do so. Cf. Cook, 560 F.2d at 982 (a lessee who is excused from drilling a second well is not necessarily excused from seeking alternative remedies to protect against drainage).
 
 
 30
 Oklahoma law recognizes that a lessee may have an implied obligation to seek appropriate administrative action where necessary to protect the lessor's interests. See Spaeth v. Union Oil Co., 710 F.2d 1455, 1458 (10th Cir.1983) (applying Oklahoma law); Sinclair, 441 P.2d at 447. But see Sunray DX Oil Co. v. Crews, 448 P.2d 840, 844-45 (Okla.1968) (stating that the Oklahoma Supreme Court had never recognized an implied covenant requiring a lessee to appear in a proceeding before a regulatory agency to obtain orders favorable to the lessor and declining to reach the question of the validity of such an implied covenant under the facts of that case).
 
 
 31
 In Sinclair, lessors sued their lessees for failure to prudently develop, operate and produce the lease. The lessors claimed that the lessees should have produced a well drilled on their property. The court agreed that the lessees had acted prudently in not producing the well because to produce the well as an oil well, as the lessors urged, would have resulted in a substantial waste of both oil and gas. However, other wells in the same reservoir were being produced, also at a substantial loss of oil and gas, and their production was draining the lessors' lease. The court held that, even though the lessees had properly refused to produce a well on the leased premises, they could still be liable in damages for failing to ask the OCC to stop the other wells in the area from producing oil in a way that wasted great quantities of gas and incidentally drained the lessors' property. 441 P.2d at 447.
 
 
 32
 Similarly, the plaintiffs here claim that, regardless of whether the defendants acted properly in not drilling another well on section 14, the defendants had a duty to take other steps to prevent the well on section 15 from draining section 14. Specifically, the plaintiffs claim the defendants should have asked the OCC either to lower production in the draining well or to require payment of a compensatory royalty on the excess production from the draining well.
 
 
 33
 Neither the OCC nor the district court expressly considered alternative measures to protect section 14 from drainage.[6] If a claim does not challenge the OCC's findings or conclusions, it is not barred as a collateral attack on an OCC order. See Greyhound Leasing & Fin. Corp. v. Joiner City Unit, 444 F.2d 439, 445 (10th Cir.1971) (an action that did not directly or indirectly challenge an OCC order or otherwise draw it in issue was not a collateral attack on the order); Samson Resources Co. v. Corporation Comm'n, 702 P.2d 19, 23 (Okla.1985) (where a dispute over who should be the unit operator did not concern the disproportionate taking of gas from a common source of supply and thus did not involve correlative rights, the dispute was beyond the OCC's jurisdiction, and the district court could properly entertain the claim).
 
 
 34
 Although the OCC's order does not address these alternative forms of relief, we believe the plaintiffs' claim nevertheless constitutes an impermissible collateral attack on the OCC order since it would require the OCC to reverse its findings supporting the order.
 
 
 35
 The OCC can adjust allowable levels of production from wells in a common source of supply, see Okla.Stat.Ann. tit. 52, Sec. 87.1(a) & (c); Samson Resources, 702 P.2d at 22, 23, or impose a penalty on future allowables from an offsetting well, see GMC Oil & Gas Co. v. Texas Oil & Gas Corp., 586 P.2d 731, 733-34 (Okla.1978); Halpin v. Corporation Comm'n, 575 P.2d 109, 112 (Okla.1977). However, it can only do so where necessary to prevent waste or protect correlative rights. See Okla.Stat.Ann. tit. 52, Sec. 87.1. Before the OCC could reduce the allowable for the section 15 well or otherwise penalize it, it had to find that the section 15 well was causing uncompensated drainage. See Anson Corp., 841 P.2d at 588. The OCC did not expressly determine whether section 15 was draining section 14, but it did determine that whatever drainage section 14 was suffering was not uncompensated. That finding was necessary to the OCC's conclusion that another well should not be drilled in section 14 and was therefore not subject to collateral attack. The OCC could not have granted the relief the plaintiffs claim the defendants should have sought without effectively overturning its factual findings that section 14 was not suffering uncompensated drainage but was receiving its fair share of gas from the common source of supply. Because the defendants could not have obtained the relief the plaintiffs claim they should have sought without collaterally attacking the OCC order, the defendants cannot be liable for not seeking such relief.[7]
 
 
 36
 The plaintiffs concede that the OCC resolved the factual issue of whether section 14 was suffering uncompensated drainage. See Corrected Br. of Aplts. at 7. The plaintiffs suggest, however, that the standard for determining the defendants' liability is not whether section 14 was suffering uncompensated drainage but whether section 14 was suffering drainage at all. They claim that a prudent operator would have taken steps to prevent drainage from section 14, even if section 14 was not suffering any net drainage. As the plaintiffs point out, the OCC did not find that section 15 was not draining section 14--only that whatever drainage section 14 was experiencing was compensated for by production from the Meacham No. 1-14 well, which was apparently draining hydrocarbons from other sections.
 
 
 37
 The plaintiffs cite no cases to support their argument that compensated drainage is sufficient to impose liability on a lessee. Instead, they rely on two treatises. See 5 Howard R. Williams & Charles J. Meyers, Oil and Gas Law Secs. 822.3 & 822.4 (1995); 5 Eugene Kuntz, A Treatise on the Law of Oil and Gas Sec. 61.3 at 175 (1991).[8] Professors Williams and Meyers explain the rationale for this position as follows: Under the rule of capture, a landowner has a right to drill for and recover all the minerals underlying his land. If oil and gas underlying his property migrate to a neighboring tract, the landowner has lost the right to reduce those particular minerals to possession and has been injured to that extent, "regardless of how much oil or gas has migrated to the leasehold." See 5 Williams & Meyers, supra, Sec. 822.3 at 97-98. A prudent operator, they conclude, would take steps to prevent such drainage, even if it was suffering no net loss. See id. Sec. 822.4 at 102.
 
 
 38
 The plaintiffs have cited no Oklahoma cases on point, but in an analogous situation--where the lessor owns an interest in both the drained tract and the draining tract--Oklahoma allows the lessor to recover only his net loss, that is, the amount lost from the drained tract less the amount received from the draining tract as a result of the drainage, suggesting that a lessor is entitled to recover only for uncompensated drainage. See Feely v. Davis, 784 P.2d 1066, 1068-69 (Okla.1989); Indian Territory Illuminating Oil Co. v. Rosamond, 190 Okla. 46, 120 P.2d 349, 355-56 (1941).[9]
 
 
 39
 We need not decide whether Oklahoma would recognize as an abstract proposition that a party who has suffered drainage has been injured, regardless of whether the drainage has been compensated for by other drainage. Everything the plaintiffs claim the defendants here should have done required the approval of the OCC. The OCC is required to consider the correlative rights of other interest holders in the common source of supply. See Okla.Stat.Ann. tit. 52, Sec. 87.1. Where the state, through the OCC, undertakes to protect the correlative rights of owners in a common source of supply, the law of capture--the theoretical underpinning for the plaintiffs' proposed rule--does not apply. See Palmer Oil Co. v. Phillips Petroleum Co., 204 Okla. 543, 231 P.2d 997, 1012 (1951), appeal dismissed, 343 U.S. 390, 72 S.Ct. 842, 96 L.Ed. 1022 (1952). Where, as here, the OCC has established spacing and drilling units for a common source of supply, a lessee or operator is not free to take more than its fair share of oil and gas. "All parties are prohibited from taking an unproportioned amount." GMC, 586 P.2d at 733 (emphasis in original). Regardless of whether section 15 is draining section 14, the OCC expressly found that owners in section 14 were and would continue to receive their fair share of gas. "[W]hen, as here, the judicial relief sought depends entirely upon the adjustment and protection of correlative rights already ruled on by the [OCC], the court is not at liberty to make such a[n] award if the [OCC] has concluded that no correlative rights have been violated." Ruyle, 44 F.3d at 845. The OCC determined that the owners in section 14 were already receiving their fair share of gas from the common source of supply and that Conoco had acted as a prudent operator. The defendants could not be liable for failing to obtain for the plaintiffs more than their fair share of gas where, as here, they needed OCC approval and the OCC could not have authorized them to take more than their fair share.
 
 
 40
 Our conclusion that the plaintiffs' claims are barred as a collateral attack on the OCC order is consistent with Oklahoma case law. In Woods Petroleum Corporation v. Sledge, 632 P.2d 393 (Okla.1981), a well operator brought a quiet title action to determine the rights of mineral owners to participate in the drilling of three additional wells. The OCC had granted the operator permission to drill the additional wells, conditioned on its commencement of drilling within 120 days. The operator did not begin drilling within 120 days, and the OCC order lapsed. The court noted that, in determining whether and under what conditions the operator could drill additional wells, the OCC had necessarily adjusted the equities among the parties, and the operator had not appealed the OCC's order. The court concluded that the operator's quiet title action was an effort to establish rights that the OCC had already considered and adjusted. As such, it was "an unpermitted collateral attack" on the OCC order, and the district court therefore lacked jurisdiction to entertain the action. See 632 P.2d at 396. See also Pelican Prod. Corp. v. Wishbone Oil & Gas, Inc., 746 P.2d 209, 211-12 (Okla.Ct.App.1987) (the district court lacked subject matter jurisdiction over an action seeking damages for conversion of hydrocarbons from one formation where the OCC had determined that the defendant's wells were producing from other formations; the OCC had sole authority to determine from which formation the defendant's wells were producing, and the court could not make that determination in the face of an OCC order to the contrary).[10] Similarly, here the OCC considered and adjusted the correlative rights of owners in the Des Moines common source of supply when it found that an additional well should not be drilled in section 14, and the district court could not entertain an action that collaterally attacked the OCC's findings.
 
 III.
 
 41
 The plaintiffs and amicus argue that this court's decision in Tidewater Oil Company v. Jackson, 320 F.2d 157 (10th Cir.), cert. denied, 375 U.S. 942, 84 S.Ct. 347, 11 L.Ed.2d 273 (1963), precludes the court from giving the OCC order any preclusive effect. In Tidewater, we held that an order of the Kansas Corporation Commission authorizing Tidewater to flood its properties did not insulate Tidewater from liability to adjoining leaseholders whose property was damaged as a result. We recognized that "[t]he determinations of the Kansas Corporation Commission, of matters within its competence, is undoubtedly binding here, insofar as applicable to this asserted claim." 320 F.2d at 161. But the Kansas Corporation Commission did not consider Tidewater's liability for its flooding operations. In fact, it specifically recognized that the owners of producing wells might well have an action for damages for the flooding of their wells but that the commission did not have jurisdiction over such a claim. See id. at 160. The court held that "the issue of tort liability for the acts done and performed by Tidewater, in the exercise of its right granted by the Commission to water flood its properties, survives the determinations of the Commission." Id. at 162.
 
 
 42
 Tidewater is easily distinguished. Tidewater rested on the principle that a party who does a lawful act can still be liable for any damage he causes. See id. at 161-62. See also Greyhound Leasing & Fin. Corp. v. Joiner City Unit, 444 F.2d 439, 442 (10th Cir.1971) (a legalized use of property can still be a nuisance) (applying Oklahoma law); Snyder Ranches, Inc. v. Oil Conservation Comm'n, 110 N.M. 637, 798 P.2d 587, 590 (1990) (a license to inject salt water into a disposal well does not authorize trespass or other tortious conduct by the licensee or immunize the licensee from liability for harm flowing from the licensed activity). The plaintiff in Tidewater did not challenge the corporation commission's order granting the defendant permission to flood his property, nor was the plaintiff's claim inherently inconsistent with the commission's finding that flooding of the property was warranted. Instead, the plaintiff simply sought to hold the defendant liable for damages caused by his lawful act. Here, on the other hand, the plaintiffs are trying to hold the defendants liable for not doing something the OCC prohibited them from doing. One cannot incur liability by refusing to do something contrary to law. See Sinclair Oil & Gas Co. v. Bishop, 441 P.2d 436, 446-47 (Okla.1967). The defendants could not have drilled a second well without ignoring the OCC order and violating Oklahoma law. Thus, the plaintiffs' claims here directly challenge the OCC order.
 
 
 43
 The court in Tidewater based its decision on the principle that "the fact that an act is lawfully undertaken and lawfully done does not, ipso facto, relieve the actor of liability for the harmful consequences of his act." 320 F.2d at 161-62. Nevertheless, the court went on to say, in dicta,
 
 
 44
 It is wholly inadmissible and incompatible with fundamental principles of due process to hold that a tribunal, possessing no power to adjudge tort liability, may nevertheless deprive a tort claimant of his day in court on that issue, by conclusive adjudication of the operative facts upon which his claim must rest.
 
 
 45
 Id. at 162. We believe this last statement goes too far. It is now well settled that facts found administratively can have a preclusive effect in later legal proceedings. See, e.g., United States v. Utah Constr. & Mining Co., 384 U.S. 394, 421-22, 86 S.Ct. 1545, 1559-60, 16 L.Ed.2d 642 (1966); Long v. Laramie County Community College Dist., 840 F.2d 743, 750-52 (10th Cir.), cert. denied, 488 U.S. 825, 109 S.Ct. 73, 102 L.Ed.2d 50 (1988); Bowen v. United States, 570 F.2d 1311, 1320-23 (7th Cir.1978); Bostwick v. Atlas Iron Masters, Inc., 780 P.2d 1184, 1187 (Okla.Ct.App.1988). In fact, Oklahoma has given preclusive effect to OCC orders. See, e.g., Leede Oil & Gas, Inc. v. Corporation Comm'n, 747 P.2d 294, 298-99 (Okla.1987). To the extent Tidewater suggests that ultimate facts found in administrative proceedings can never be binding in a subsequent tort action, we disavow its dicta.[11]
 
 IV.
 
 46
 On a collateral attack, such as this, the district court had no jurisdiction to inquire into the facts determined in the OCC proceedings. It could only determine from the face of the proceedings whether the OCC had jurisdiction to issue the order.[12] See, e.g., SKZ, Inc. v. Petty, 782 P.2d 939, 943 (Okla.1989); Harry R. Carlile Trust, 732 P.2d at 441; State v. Corporation Comm'n, 590 P.2d 674, 677 (Okla.1979). The plaintiffs have not directly attacked the OCC's jurisdiction on appeal,[13] and the OCC clearly had subject matter jurisdiction over Great Bear's application to drill a second well on section 14. See Okla.Stat.Ann. tit. 52, Sec. 87.1(a).
 
 
 47
 In the trial court, the plaintiffs claimed that the OCC order was void because plaintiff Tim Ruyle was not mailed notice of the OCC proceedings.[14] If Mr. Ruyle was not given proper notice of the OCC proceedings, the OCC's jurisdiction would have been defective at least as to him. See Anson Corp. v. Hill, 841 P.2d 583, 586-87 (Okla.1992). It appears that Mr. Ruyle may not have received personal notice of the initial application and hearing. Aplee.Supp.App. at 52-74. However, notice was also published, see id. at 61-67, and, before the administrative law judge concluded the hearings and issued her initial report, Great Bear amended its application so that it could give notice to those interest owners who had been overlooked in the initial mailing. See id. at 122, p 20. A copy of the amended application and notice of hearing was mailed to Timothy J. Ruyle on March 6, 1991, before the hearings on Great Bear's application were concluded. See id. at 104-10. The plaintiffs have not met their burden of showing that the OCC lacked jurisdiction to issue its order. Cf. Forest Oil Corp. v. Corporation Comm'n, 807 P.2d 774, 783-84 (Okla.1990) (notice of OCC proceedings mailed to all parties listed in the applicant's records was adequate, even though the records contained no address for four identified interest owners, where notice was also published after the first day of hearings on the merits but before the hearings were concluded).
 
 V.
 
 48
 Our conclusion that the OCC order barred the plaintiffs' claims for breach of the defendants' implied covenants does not mean that the plaintiffs are without any remedy. It simply means that they are in the wrong forum. If, as they suggest, Conoco misrepresented facts to the OCC or if conditions or knowledge of conditions have changed since the OCC found that the Meacham No. 1-14 well was recovering for the owners in section 14 their fair share of the gas in the Des Moines common source of supply, then the plaintiffs can ask the OCC to repeal, amend or modify its prior order.[15] It does not appear that the plaintiffs have made such a showing before the OCC. Until they do, the OCC's order bars the plaintiffs' claims for breach of implied covenants and breach of fiduciary duty.[16]
 
 
 49
 The district court properly granted the defendants' motions for partial summary judgment. Accordingly, we AFFIRM the district court's orders and remand this action for further proceedings consistent with this opinion.
 
 
 
 *
 The Honorable Bruce S. Jenkins, Senior District Judge, United States District Court for the District of Utah, sitting by designation
 
 
 [1]
 Conoco filed a third-party complaint against Kirkland, claiming that Kirkland tortiously interfered with Conoco's relationship with its lessors and seeking to have the agreements between Kirkland and the plaintiffs invalidated. Kirkland was later realigned as an additional plaintiff. Conoco's claims against Kirkland have been stayed pending this appeal
 
 
 [2]
 The parties later stipulated to a dismissal of the plaintiffs' royalty underpayment claims without prejudice
 
 
 [3]
 Specifically, the plaintiffs claim that collateral estoppel should not apply here because the notice of the OCC proceedings was deficient in that it did not indicate that drainage was an issue before the OCC, because Conoco's alleged misconduct in misleading the OCC precludes it from relying on collateral estoppel, because the plaintiffs could not have foreseen that the OCC findings could have preclusive effect and because the following differences between the OCC proceedings and this action make the application of collateral estoppel here unfair: the plaintiffs have a right to a jury trial in this action, whereas there was no such right before the OCC; different standards of proof applied in the OCC proceedings than apply in this case; the OCC proceedings were for nonmonetary relief, whereas the plaintiffs here seek substantial money damages; OCC procedures were less extensive than trial court procedures; and the OCC proceedings involved public rights, not private rights, such as those involved in this action. Ruyle expressly considered (and rejected) only this last argument. See 44 F.3d at 844-45
 
 
 [4]
 Oklahoma law defines "waste" as applied to gas to include the production of gas in such quantities as unreasonably to diminish the quantity of oil or gas that can be recovered from a common source of supply and the unnecessary depletion or inefficient use of gas contained in a common source of supply. See Okla.Stat.Ann. tit. 52, Sec. 86.3 (1991). See also id. Sec. 237. "Waste" includes a "loss of ultimate recovery" of minerals and "can consist of unreasonable production or unreasonable non-production." Kuykendall v. Corporation Comm'n, 634 P.2d 711, 716 (Okla.1981) (citations omitted). It also includes those factors that affect "the practicable recoverability of minerals" from land. Id. at 717
 The Oklahoma Supreme Court has defined "correlative rights" to include "the relative rights of owners in a common source of supply to take oil or gas by legal operations limited by duties to the other owners (1) not to injure the common source of supply and (2) not to take an undue proportion of the oil and gas." Kingwood Oil Co. v. Hall-Jones Oil Corp., 396 P.2d 510, 512 (Okla.1964).
 
 
 [5]
 The plaintiffs claim that the fact that the OCC permitted three wells to be drilled on an adjoining section (section 23) was also a material change in condition. The plaintiffs have not shown how that fact changes any of the facts the OCC relied on in making its decision, and the OCC's order allowing additional wells in section 23 was entered before the OCC's order denying an additional well in section 14 and thus was not a material change in conditions. See Aplt.App. at 84-86; Aplee. Supp.App. at 43-45. In any event, any argument about changed conditions is properly addressed to the OCC, not the court
 
 
 [6]
 Although the district court did not expressly rule on the plaintiffs' claim for breach of an implied covenant to seek favorable administrative action, its ruling on Conoco's motion for partial summary judgment implicitly denied the claim. Conoco's motion for partial summary judgment asked for judgment on all of the plaintiffs' claims except the royalty underpayment claims, and the district court granted Conoco's motion except as to punitive damages
 
 
 [7]
 At oral argument, counsel for the plaintiffs suggested that, in addition to asking the OCC to reduce the allowable for the section 15 well or otherwise penalize its production, the defendants should have asked the OCC to increase the allowable for the Meacham No. 1-14 well. Such a claim is also barred as a collateral attack on the OCC order, since the OCC determined that the Meacham No. 1-14 well was already recovering for the owners in section 14 their fair share of the gas in the Des Moines common source of supply and thus would not be entitled to any greater production
 
 
 [8]
 The only authority Professors Williams, Meyers and Kuntz cite for their position--Pan American Petroleum Corporation v. Hardy, 370 S.W.2d 904 (Tex.Civ.App.1963)--is distinguishable because it involved separate reservoirs. The lessor in Pan American was damaged by drainage from one reservoir but benefited from drainage into a different reservoir. The court held that the implied covenant of protection applied to each reservoir separately, so the lessor could seek damages for drainage from reservoir A even though reservoir B had actually gained minerals. See 370 S.W.2d at 908. Because Pan American viewed each reservoir separately, it only supports recovery for uncompensated drainage. Other cases have suggested that a lessor who suffers no net loss from drainage has no claim for breach of the lessee's implied covenants. See Carter Oil Co. v. Dees, 340 Ill.App. 449, 92 N.E.2d 519, 524 (Ct.1950); Central Ky. Natural Gas Co. v. Williams, 60 S.W.2d 580, 583, 584 (Ky.1933); Louisiana Gas Lands, Inc. v. Burrow, 197 La. 275, 1 So.2d 518, 521 (1941); Continental Oil Co. v. Blair, 397 So.2d 538, 540, 543 (Miss.1981); Olson v. Signal Drilling & Exploration, Inc., 151 Mont. 122, 439 P.2d 763, 765-66 (1968); Chapman v. Sohio Petroleum Co., 297 S.W.2d 885, 887 (Tex.Civ.App.1956)
 
 
 [9]
 Professor Kuntz suggests that the analogy to such cases is a false one, since a prudent operator would still drill a protection well if by doing so he could profitably recover more oil and gas, regardless of whether the drainage he was suffering was compensated. See 5 Kuntz, supra, Sec. 61.3 at 175. In Oklahoma, however, in a situation like this the prudent operator needs the OCC's permission to drill a second well, and the OCC denied permission to drill a second well on section 14 where section 14 was suffering no uncompensated drainage
 
 
 [10]
 Citing Oklahoma Rule of Appellate Procedure 1.200(C)(B), the plaintiffs claim that Pelican Production is not precedent under Oklahoma law. The rule is not entirely clear on the precedential value of Oklahoma Court of Appeals' opinions. See Okla.R.App.P. 1.200(C)(B), Okla.Stat.Ann. tit. 12, ch. 15, App. 2 (Supp.1995). Of course, in determining Oklahoma law we are not bound by decisions of lower state courts. See Commissioner v. Estate of Bosch, 387 U.S. 456, 465, 87 S.Ct. 1776, 1782, 18 L.Ed.2d 886 (1967); King v. Order of United Commercial Travelers, 333 U.S. 153, 160-61, 68 S.Ct. 488, 492-93, 92 L.Ed. 608 (1948). We must determine issues of state law as we believe the highest court in the state would determine them. Daitom, Inc. v. Pennwalt Corp., 741 F.2d 1569, 1574 (10th Cir.1984). However, decisions of a state's intermediate appellate courts are some evidence of how the state supreme court would decide the issue, and we can consider them as such, even if they are not binding precedent under state law. See West v. American Tel. & Tel. Co., 311 U.S. 223, 237, 61 S.Ct. 179, 183-84, 85 L.Ed. 139 (1940); Perlmutter v. United States Gypsum Co., 4 F.3d 864, 869 n. 2 (10th Cir.1993); Romero v. International Harvester Co., 979 F.2d 1444, 1449 n. 3 (10th Cir.1992)
 
 
 [11]
 Tidewater itself gave preclusive effect to the Kansas Corporation Commission's order on the issue of punitive damages. The court noted that, under Kansas law, a party seeking punitive damages must show that the defendant's acts constituted a "gross neglect of duty" showing "a reckless indifference of the rights of others." 320 F.2d at 165 (citations omitted). The court concluded that the commission's order made the defendant's actions lawful, precluding an award of punitive damages. See id
 
 
 [12]
 The "face of the proceedings" means the application, the process by which the parties were notified and the OCC's order. See Harry R. Carlile Trust v. Cotton Petroleum Corp., 732 P.2d 438, 441 & n. 8 (Okla.1986), cert. denied, 483 U.S. 1007, 1021, 107 S.Ct. 3232, 3265, 97 L.Ed.2d 738, 764 (1987); Mullins v. Ward, 712 P.2d 55, 59 n. 7 (Okla.1985)
 
 
 [13]
 The plaintiffs only claim that the OCC had no jurisdiction to consider claims involving private rights and that its order should therefore not have any preclusive effect in a case such as this, which is seeking redress for violations of private rights. This court rejected the argument in Ruyle. See 44 F.3d at 844-45. The fact that the OCC lacked jurisdiction to consider the plaintiffs' claims in this case is irrelevant. Those claims were never brought before the OCC. The only question here is whether the OCC's findings on the matters before it bars the plaintiffs' claims in this action. That depends on whether the OCC was acting within its jurisdiction when it made its findings and whether those findings were essential to its order. We answer both questions in the affirmative
 
 
 [14]
 On appeal, the plaintiffs raise the adequacy of the notice of the OCC proceedings only as a factual issue they claim precluded summary judgment and as an additional reason why collateral estoppel should not apply. See Corrected Br. of Aplts. at 9 & 26. The plaintiffs claim the notice of the OCC proceedings was defective because it did not say that drainage would be an issue. They cite no authority for the proposition that an OCC order can be collaterally attacked if the notice of the proceedings does not specify every issue the OCC might consider in the proceedings. The notice here indicated that Great Bear sought authority to drill an additional well in section 14. The OCC could only authorize another well in section 14 to prevent waste or to protect correlative rights. See Okla.Stat.Ann. tit. 52, Sec. 87.1(a). Drainage is perhaps the most common factor affecting correlative rights. Cf. Leck v. Continental Oil Co., 971 F.2d 604, 606 (10th Cir.1992) ("Drainage and correlative rights are, of course, directly related"). We believe the plaintiffs were sufficiently apprised of the fact that drainage could be an issue in the OCC proceedings
 
 
 [15]
 The plaintiffs argue that they should not have to seek relief from the OCC before they can pursue private remedies in district court. We do not hold that a lessor must seek relief from the OCC before bringing an action for breach of a lease obligation. We simply hold that, where the OCC has already considered and made findings on underlying facts relevant to the lessor's claims, neither the lessor nor the court can ignore the OCC's ruling. A plaintiff need not go to the OCC before bringing an action, but where an OCC order stands as a bar to his claims in district court, the plaintiff must first ask the OCC--not the district court--to remove the bar
 
 
 [16]
 Citing an advisory report of an OCC task force, the plaintiffs suggest that the OCC itself does not believe its orders should have preclusive effect in private civil disputes. Of course, the Oklahoma legislature is free to change the statute barring collateral attacks on OCC orders, but until it does we are required to apply the statute. The plaintiffs' arguments for changing the statute are properly addressed to the legislature