F I L E D
United States Court of Appeals
Tenth Circuit

JUN 10 1997

PATRICK FISHER
Clerk

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

_____

MOSE C. WATTS, individually; MOSE C. WATTS,
Co-Trustee of the Mose C. Watts Ranch Trust; RONALD
W. MCGEE, as Co-Trustee of the Mose C. Watts Ranch
Trust; EDITH B. WARTICK; JOHN ALLEN WARTICK;
RITA L. PARK; JUDITH ANN HOLLINGBACK;
THOMAS OWEN WARTICK; EDITH B. WARTICK,
Co-Trustee of the Edith B. Wartick Trust; JOHN ALLEN
WARTICK, Co-Trustee of the Edith B. Wartick Trust;
RITA L. PARK, Co-Trustee of the Edith B. Wartick Trust;
THE WARTICK FAMILY LIMITED PARTNERSHIP, an
Oklahoma Limited Partnership; RAAN LADAWN JONES,
also known as Ladawn Jones; WINFREY TURNER,
individually; BILLY JEAN TURNER; TRUMAN
MATHIEWS, individually; DEVOLA MATHIEWS,
individually; TRUMAN MATHIEWS, Trustee of the
Truman Mathiews Trust and of the Devola Mathiews
Trust; DEVOLA MATHIEWS, Trustee of the Truman
Mathiews Trust and of the Devola Mathiews Trust; H. L.
DOLLINS, III; ANGELINA DOLLINS; NANCEY
DOLLINS SUDDUTH; VIOLET DOLLINS; GEORGE
MILTON DOLLINS; DAVID DOLLINS; JACK
DOLLINS; BEVERLY ANN DOLLINS; CREEDA JUNE
DOLLINS; ROCKY DEAN DOLLINS; KAREN DANON
CHANEY; ROBSON ROYALTY CO.; JERRY L.
DOLLINS; RUTH EVERY; RUTH EVERY, as Trustee of
the Allen Every Revocable Trust; RUTH EVERY, as
Trustee of the Ruth Every Revocable Trust; W. P.
LERBLANCE; EARL JEFFREY; JAMES DAVID
LUCAS, also known as David Lucas; BETTY LEFLORE;
HELEN CALDWELL; FRANCES RICHMOND; JAMES
F. ELLIOTT; LINDA L. ANGELI; DEBBIE HOLUBY;
BILLIE JEAN LEFLORE; NEIL WAYNE DOLLINS,

No. 96-7041

Plaintiffs - Appellants,

v.

ATLANTIC RICHFIELD COMPANY; VASTAR
RESOURCES, INC.,

Defendants - Appellees.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA
(D. Ct. No. CV-95-339)**

---

Terry Joe Barker, Pezold, Richey, Caruso & Barker, Tulsa, Oklahoma (Danny P. Richey and Joseph C. Woltz, Pezold, Richey, Caruso & Barker, Tulsa, Oklahoma, Douglas G. Dry, Wilburton, Oklahoma, and George Zellmer, Allford, Ashmore, Ivester & Zellmer, McAlester, Oklahoma, with him on the briefs), appearing for the Plaintiffs-Appellants.

Jay A. Brandt, Hutcheson & Grundy, Dallas, Texas (Cynthia L. Frankel and Nishita S. Shah, Hutcheson & Grundy, Dallas, Texas, and Joe Stamper, Stamper & Hadley, Antlers, Oklahoma, with him on the brief), appearing for the Defendants-Appellees.

---

Before TACHA, McWILLIAMS, and BALDOCK, Circuit Judges.

---

TACHA, Circuit Judge.

---

Several lessors of oil and gas mineral interests ("Lessors") brought this diversity action against their lessee, Atlantic Richfield Company and Vastar Resources, Inc. (collectively "ARCO"). Lessors allege that ARCO: (1) failed to pay royalties on proceeds received from the settlement of certain disputes with its gas purchaser, Arkla Energy Resources ("Arkla"), (2) failed to obtain the highest price available for Lessors' gas, and (3) failed to protect several of Lessors' units against drainage. The district court granted summary judgment to ARCO on all three claims. We exercise jurisdiction pursuant to 28 U.S.C. § 1291. For the reasons set forth below, we reverse and remand for further proceedings.

## BACKGROUND

Lessors own oil and gas mineral interests located in the Wilburton Field in Latimer County, Oklahoma. There are forty-one separate oil and gas leases between Lessors and ARCO setting forth the respective obligations of the parties.[1]

---

[1] The leases provide in pertinent part:

Leases #1-22
The lessee shall pay lessor, as royalty, one-eighth of the proceeds from the sale of the gas, as such from wells where gas is only found. . .

Leases #23-24
The lessee shall pay to lessor for gas produced from any oil well and used by the lessee . . . as royalty 1/8 of the market value of such gas at the mouth of the well; if said gas is sold by the lessee, then as royalty 1/8 of the proceeds of the sale thereof at the mouth of the well.

## I. THE ROYALTY DISPUTE AND SETTLEMENT AGREEMENT

Lease #25, as contained in the record on appeal, is illegible.

Leases #26-30
And where gas only is found one-eighth of the value of all raw gas at the mouth of the well, while said gas is being used or <u>sold off the premises</u> . . .

Leases #31-36
To pay lessor for gas of whatsoever nature or kind <u>produced and sold</u> or used off the premises . . . one eighth (1/8) at the market price at the well for the gas sold . . .

Lease #37
If gas, as above defined, <u>produced</u> from any well is sold by Lessee, then Lessee shall pay Lessor one quarter (1/4) of the proceeds thereof at the well received by the Lessee from the sale . . . All such payments shall be received and accepted by Lessor as full compensation for all such gas.

Lease #38
The Lessee shall deliver to the credit of the Lessor as royalty . . . the equal of 1/4 part of all oil <u>produced and saved</u> from the leased premises . . . or at Lessee's option, Lessee may from time to time purchase such royalty oil by paying to the Lessor for such 1/4 royalty the market price at the well . . .

Lease #39
The lessee shall pay lessor, as royalty on gas . . . the market value at the mouth of the well of one-eighth of the gas so <u>sold or used</u>, provided that on gas <u>sold</u> at the wells the royalty shall be one-eighth of the amount realized from such sale. . .

Leases #40-41
To pay lessor one-eighth (1/8) of the gross proceeds each year, payable quarterly, for the gas from each well where gas only is found. . .

App't. App. at 100-193.

Pursuant to a long-term gas purchase contract, ARCO has supplied Arkla, a natural gas pipeline and gas purchaser, with natural gas produced from the Wilburton Field at stipulated prices. In 1988, ARCO and Arkla became involved in litigation over Arkla's refusal to purchase gas from the Wilburton Field. Arkla contended that it was not obligated to take gas from ARCO's Wilburton wells because the gas did not meet quality specifications and, therefore, ARCO had improperly classified the wells as § 103 wells under the Natural Gas Policy Act ("NGPA"). See 15 U.S.C. § 3313. Based on Arkla's refusal to take gas and pay the correct contract price, ARCO brought a claim for breach of contract against Arkla. In its complaint, ARCO sought damages of $279 million, reflecting the highest lawful price Arkla allegedly was obligated to pay for NGPA § 103 gas.

During settlement negotiations, ARCO and Arkla became involved in a separate dispute involving Arkla's gas purchases from a field located off the shore of Louisiana in the Gulf of Mexico, known as the Mississippi Canyon. In 1987, the parties had attempted to resolve the dispute regarding the Mississippi Canyon by entering into a Compromise and Settlement Agreement ("1987 Settlement Agreement") under which Arkla made a recoupable $30 million prepayment to ARCO for gas from the Mississippi Canyon. The parties, however, continued to dispute their respective obligations under the 1987 Settlement Agreement.

On February 8, 1989, ARCO and Arkla entered into a settlement agreement ("1989 Settlement Agreement") resolving both the Wilburton litigation and the Mississippi Canyon dispute. ARCO agreed to sell gas from the Wilburton Field to Arkla at an initial price of $2.20 per MMbtu to be adjusted later according to a formula. In return, ARCO received: (1) sixty monthly recoupable prepayments of $5 million ($300 million total) for gas from the Wilburton Field, (2) a new gas gathering system in the Wilburton Field, (3) Arkla's agreement to enter into a gas transportation contract, at specified discount rates, for gas from the Wilburton Field, (4) a $35 million recoupable prepayment for gas from the Mississippi Canyon, and (5) a January 1, 1995 deadline for ARCO to refund any unrecouped portion of the $300 million prepayment for the Wilburton Field, the $35 million prepayment for the Mississippi Canyon, and the $30 million prepayment under the 1987 Settlement Agreement.

Since the 1989 Settlement Agreement, ARCO has paid Lessors royalties on gas produced and sold from the Wilburton Field. ARCO, however, has not paid royalties on any of the other settlement proceeds. Lessors brought this suit against ARCO seeking damages for ARCO's failure to pay royalties on the settlement proceeds. Lessors sought royalties under six separate legal theories: (1) breach of the contractual duty to pay royalties, (2) breach of the implied covenant to market, (3) breach of fiduciary duty, (4) constructive fraud, (5)

breach of the duty of good faith, and (6) civil conspiracy. Lessors also sought damages against ARCO for failing to obtain the best price available for Lessors' gas under the 1989 Settlement Agreement. The district court granted summary judgment to ARCO on both of Lessors' claims.

1.    **THE DRAINAGE ISSUE**

In the mid-1980s, ARCO discovered the Arbuckle formation, a large source of natural gas underlying other formations in the Wilburton Field. ARCO is the operator of fourteen of sixteen wells producing gas from the Arbuckle formation pursuant to private joint operating agreements with other working interest owners.[2]

On January 31, 1991, the Oklahoma Corporation Commission ("OCC") issued Field Rules, retroactive to May 1, 1990, recognizing the Arbuckle Formation as a common source of supply, meaning that any one well could ultimately drain all the gas in the formation. The Field Rules established certain limits on the monthly production of each unit, called "allowables." The OCC determined that because seven of the Arbuckle wells were limited in their ability

---

[2] Each well is composed of a separate 640-acre drilling and spacing unit. See Okla. Stat., tit. 52, § 87.1 91993) (authorizing the Oklahoma Corporation Commission to establish well spacing units to prevent waste and to protect the correlative rights of interested parties in a common source of supply). Unless the OCC grants an exception, only one well is permitted to be drilled in each drilling and spacing unit.

to produce gas, the Field Rules were necessary to ensure that each well would produce approximately its fair share of the gas.

The Field Rules contained several provisions concerning the treatment of a well that is underproducing its allowable, known as an "underage." The Field Rules specified that underages accumulated by a well could be carried forward and added onto that well's monthly allowable, effectively increasing the limit on future production. If a well's underages exceeded a specified amount, however, those underages would be canceled. The Field Rules contained an "Effective Date" provision as follows:

> These rules shall be effective May 1, 1990, and the Unit Operator of each Unit <u>shall have the period from the effective date of the rules to December 31, 1991 to adjust any over and under production</u> before it is adjusted in accordance with [the cancellation provision].

App't. App., Vol. I at 227 (emphasis added).

After the Field Rules were issued, three of ARCO's wells (the Yourman No. 2, the Costilow No. 3, and the Kilpatrick No. 2) began to accrue underages each month and were approaching the point at which their underages would be canceled pursuant to the Field Rules. In early 1991 ARCO performed "workover" operations on the three underproducing wells to increase their deliverability. The successful workovers resulted in increased production in all three wells and permitted two of the wells to make up their underages and meet the allowables established by the Field Rules.

Several of the Lessors owning interests in adjacent units contend that the workovers caused the three wells to drain gas from their units, resulting in decreased production relative to the "draining" wells. Before the district court, Lessors sought damages against ARCO for uncompensated drainage, asserting a number of theories including: (1) breach of the implied covenant to protect against drainage, (2) tortious drainage, (3) breach of fiduciary duty, (4) breach of good faith, (5) conversion, and (6) unjust enrichment. In addition, Lessors contended that by selectively performing the workovers on units in which ARCO has a greater working interest, ARCO acted tortiously, wantonly and maliciously, subjecting ARCO to liability for punitive damages. The district court granted summary judgment to ARCO on the basis that the Field Rules bar all of Lessors' claims.

## DISCUSSION

We review the grant of a motion for summary judgment de novo, applying the same standard used by the district court pursuant to Fed. R. Civ. P. 56(c). Harvey E. Yates Co. v. Powell, 98 F.3d 1222, 1229 (10th Cir. 1996) [hereinafter Yates]. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

Appellants, as the nonmoving party, must go beyond the pleadings and "must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which [they] carr[y] the burden of proof." Applied Genetics Int'l v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990). "We view the evidence and draw any inferences therefrom in the light most favorable to the party opposing summary judgment." Coosewoon v. Meridian Oil Co., 25 F.3d 920, 929 (10th Cir. 1994). "If there is no genuine issue of material fact in dispute, we must determine whether the substantive law was correctly applied by the district court." Yates, 98 F.3d at 1229.

## I.    ARCO'S DUTY TO PAY ROYALTIES

The district court granted summary judgment to ARCO on Lessors' claim for royalties because the leases did not provide for royalties to be paid on the proceeds of settlements and because none of the proceeds constituted payment for the production and sale of gas. The court reasoned that because the ARCO/Arkla litigation involved disputes over gas quality and Arkla's obligation to take gas from ARCO's wells, the settlement consideration did not constitute payment for the production and sale of gas. Thus, the district court concluded that the settlement consideration was not royalty bearing. In so holding, the court analogized such settlement consideration to non-royalty bearing take-or-pay payments.

On appeal, Lessors contend that the district court erred in concluding that the settlement proceeds were not royalty bearing. Lessors argue that Arkla would not have made the settlement payments to ARCO if Arkla were not to receive something in return. What Arkla received in return could only have been gas production:

> The only good or service sold by ARCO to Arkla under the 1989 Settlement Agreement is natural gas. The disputes between ARCO and Arkla over "interpretation of purchase contract" and "collateral issues" were disputes over the terms (i.e., price and quality) under which this gas production was to be sold. There is nothing in the record to show that ARCO provided anything to Arkla under the 1989 Settlement Agreement other than gas production. Because whatever settlement consideration ARCO received was necessarily for the production of gas, it was subject to royalties.

App't. Reply Br. at 11-12.

### a. Royalties Are Due Only on Actual Production

We begin our analysis by looking to the royalty clauses in the leases between ARCO and Lessors. Although containing slightly varying language, all of the leases require royalties to be paid only on the proceeds from the sale of gas produced from the wells—that is, gas physically extracted from the earth and sold. Under the plain terms of these so-called "production-type" leases, the lessee is not obligated to pay a royalty on the value of gas in the abstract, but only on the cash value of gas that is actually produced and sold from the leased property. See Yates, 98 F.3d at 1230 (discussing "production-type" leases); see also Roye

- 11 -

Realty & Dev., Inc. v. Watson, No. 76848, 1996 WL 515794, at *9 & n.8 (Okla. Sept. 10, 1996) [hereinafter Roye Realty] (stating that royalties are payable under production-type lease language only when gas is "produced and sold" and distinguishing cases in which royalties are payable on the "amount realized" from the sale of gas).

Because the leases expressly require royalties to be paid on gas actually produced, we hold that the district court erred in concluding that royalties are not payable here because the leases do not expressly require the payment of royalties on settlement proceeds. If the settlement proceeds constitute payment for gas actually produced and sold, it is immaterial that the leases do not explicitly provide for the payment of royalties on settlement proceeds. Rather, for the proceeds to be non-royalty bearing, the leases would have to expressly exclude settlement proceeds. See Yates, 98 F.3d at 1231 ("[A]ny portion of a settlement payment that is . . . for gas actually produced and taken by the settling purchaser is subject to the lessor's royalty interest."). Thus, the mere failure to expressly include settlement proceeds in the royalty provision of a lease, by itself, does not preclude the payment of royalties on such proceeds.

Similarly, we hold that the district court erred in concluding that the proceeds in this case should be treated like nonrecoupable take-or-pay settlements. Under a take-or-pay clause, a purchaser must take a specified

volume of gas or, failing that, must pay a sum representing the difference between the specified minimum and the volume of gas actually taken—that is, a payment in lieu of production.  See Diamond Shamrock Exploration Corp. v. Hodel, 853 F.2d 1159, 1164 (5th Cir. 1988) [hereinafter Diamond Shamrock] (discussing take-or-pay clauses).  Thus, "proceeds received by the lessee in settlement of the take-or-pay provision of a gas supply contract (for either accrued take-or-pay deficiencies or to abrogate future take-or-pay obligations) are not royalty bearing because they are payments for non-production."  Yates, 98 F.3d 1236; see also Roye Realty, 1996 WL 515794 at *9; Diamond Shamrock, 853 F.2d at 1167-68.

The non-royalty bearing nature of take-or-pay proceeds does not mean that all settlement proceeds are non-royalty bearing.  The relevant question in both cases (take-or-pay payments and settlement proceeds) is "whether or not the funds making up the payment actually pay for any gas severed from the ground."  Independent Petroleum Ass'n of Am. v. Babbitt, 92 F.3d 1248, 1260 (D.C. Cir. 1996).  In short, the nature of the settlement proceeds determines whether they are royalty bearing.  The central question in this case, therefore, is whether the settlement consideration paid to ARCO constitutes payment, at least in part, for gas actually produced and sold or whether it constitutes payment for something other than the production and sale of gas.  To that question we now turn.

**b. Are the Settlement Proceeds Attributable to Actual Production?**

In determining whether the settlement proceeds constitute payment for gas actually produced and sold, we begin with our recent decision in <u>Harvey E. Yates Co. v. Powell</u>, 98 F.3d 1222. In <u>Yates,</u> we addressed whether proceeds from the settlement of take-or-pay and pricing disputes were subject to the lessee's duty to pay royalties. The parties in <u>Yates,</u> as in this case, operated under a standard production-type lease where the duty to pay royalties was contingent upon the actual production and sale of gas. <u>Id.</u> at 1230. After deregulation of natural gas pricing, the gas purchasers in <u>Yates</u> reduced their gas "takes" and unilaterally lowered to market level the purchase price of gas actually taken, prompting a lawsuit by the gas producer. <u>Id.</u> at 1227. The parties subsequently entered into a settlement agreement in which the producer agreed to accept a nonrecoupable "buy-down" payment in exchange for certain price and take reductions in the gas supply contract. <u>Id.</u> The producer paid royalties on the proceeds from gas sold at the lower market price but failed to pay royalties on the nonrecoupable buy-down payment. <u>Id.</u> at 1227-28.

In <u>Yates</u>, we developed three "guiding principles" in deciding whether royalties are payable on settlement proceeds:

> First, royalty payments are not due under a "production"-type lease unless and until gas is physically extracted from the leased premises. Second, nonrecoupable proceeds received by a lessee in settlement of the take-or-pay provision of a gas supply contract are specifically for

- 14 -

non-production and thus are not royalty bearing. Third, any portion of a settlement payment that is a buy-down of the contract price for gas that is actually produced and taken by the settling purchaser is subject to the lessor's royalty interest at the time of such production, but only in an amount reflecting a fair apportionment of the price adjustment payment over the purchases affected by such price adjustment.

Id. at 1231. In effect, we concluded that when a lessee accepts a settlement payment in exchange for a reduced future price term, the lessors are entitled to a royalty payment on two components, each of which constitutes consideration for actual production: "(1) the proceeds obtained by the lessee from the sale of gas at the bought-down price; and (2) a commensurate portion of the settlement proceeds that is attributable to price reductions applicable to future production under the renegotiated gas sales agreement as production occurs." Id. at 1236.

In this case, the parties apparently do not dispute that ARCO has already paid royalties on the sixty monthly prepayments of $5 million (or $300 million) as gas was taken by Arkla during the five-year period from February 1, 1989 through January 31, 1994. This amount represents the first component addressed in Yates, the proceeds from the sale of gas at the bought-down price. Because royalties have already been paid on this amount, the sole controversy is whether ARCO must pay royalties on any of the other items of settlement consideration. Under Yates, if Arkla gave any of the other items of consideration in exchange for

ARCO's settling past price deficiencies or agreeing to future sales at a lower price, Lessors are entitled to a royalty on the value of those items.

On appeal, Lessors contend that Yates, handed down after the district court's decision in this case, is dispositive and requires reversal of the grant of summary judgment in favor of ARCO. In particular, Lessors assert that the record contains evidence that a portion of the settlement proceeds constitutes consideration for a reduction in the price ARCO was willing to accept for gas under the terms of its contract with Arkla. According to Lessors, prior to the 1989 Settlement Agreement, Arkla was obligated to purchase gas at the NGPA § 103 price, which ranged between $3.40 and $4.60 per MMBtu. Lessors point to the complaint ARCO filed in its lawsuit against Arkla, in which ARCO alleged damages of $279 million based on its claim that the parties' contract required Arkla to pay a price in excess of the $2.20 per MMBtu for which ARCO ultimately settled. Lessors also point to Section 4.1 of the 1989 Settlement Agreement, which explicitly refers to the new price as a "price reduction." Lessors contend that under Yates, royalties are payable on any portion of settlement proceeds that constitutes consideration for a reduction in the price a purchaser is obligated to pay for gas production.

ARCO contends that Yates is not controlling in this case because there is no evidence that the 1989 Settlement Agreement resulted in a "buy down" of the

actual price Arkla paid for gas. At argument, counsel for ARCO insisted that Arkla has never paid the higher NGPA § 103 price and, in fact, paid a pre-settlement price below the $2.20 price which ARCO ultimately accepted. ARCO thus contends that the Settlement Agreement actually resulted in a price increase for Lessors' gas. As counsel for ARCO confirmed at argument, however, the record before us does not show what price Arkla actually paid for gas prior to the 1989 Settlement Agreement. Even if ARCO were correct that an actual price increase removes this case from the ambit of Yates, providing an alternate basis for affirmance, such facts are not in the record, and thus, summary judgment in favor of ARCO on this basis is premature.

We are not convinced, however, that an actual price increase would relieve ARCO of its duty to pay royalties on proceeds received from the settlement of its pricing claim. ARCO is correct that Yates involved a "buy-down," or a reduction in the actual price paid for gas. In Yates, the settling purchaser explicitly sought and received a price reduction in exchange for a lump sum payment. See Yates, 98 F.3d at 1227. A "buy down," however, is not the shibboleth that ARCO claims it to be. Even absent a "buy down" (i.e., an actual price reduction), a lessee's refusal to pay royalties on the proceeds received from the settlement of a pricing dispute would result in a windfall for the lessee. More importantly, such a refusal

would constitute a breach of the lessee's duty to pay royalties on proceeds from the production and sale of gas. A brief example illustrates this point.

Suppose that a purchaser is obligated to take 1,000,000 units of gas at $4.00 per unit payable in two equal installments of $2 million. Upon receiving the first 500,000 units, the purchaser unilaterally reduces the price to $3.00 per unit (claiming that the gas is of substandard quality) and remits payment of only $1.5 million. In response, the producer files a lawsuit for $1 million, the amount due on the past price deficiency and the anticipated future shortfall. Instead of litigating the gas quality issue, the parties agree to settle their dispute. In exchange for a one-time lump sum payment of $500,000, the producer agrees to forgive the past price deficiency and to accept the lower price of only $3.00 per unit for future production. In this situation, there has been no "buy down" (i.e., actual price reduction). The pre-settlement price and the post-settlement price are both $3.00 per unit. Despite the absence of a price reduction, however, the lump sum payment still constitutes proceeds from the sale of gas because it represents a component of the true price paid for both past and future production under the supply contract. No one would dispute, therefore, that the royalty owners are entitled to their royalty share of the lump sum payment. The important factor triggering the duty to pay royalties is not an actual price reduction, as ARCO

contends, but rather an agreement by the producer to compromise its right to pursue a higher price in exchange for a lump sum payment.

Although Yates involved an actual price reduction, the general rule announced in Yates also applies in situations where the settlement of a pricing dispute results in a post-settlement price that remains the same, as in the example above, or where the price actually increases, as appears to be the case here. In either situation, the lessee has agreed to compromise its pricing claim in exchange for valuable consideration. From the point of view of the royalty owner, the lessee has decreased the price at which it is willing to sell gas and thus has unilaterally decreased the amount subject to the lessor's royalty interest. Therefore, whatever settlement consideration the lessee receives is a component of the true price paid for the gas and is subject to the lessors' royalty interest. In sum, a lessor's royalty interest is not limited to settlements involving an actual "buy-down," as in Yates, but extends to any settlement in which a producer receives consideration for compromising its pricing claim, assuming of course that the pricing claim relates to either past or future production actually taken by the settling purchaser.

In this case, the 1989 Settlement Agreement included several items of non-cash consideration in addition to Arkla's agreement to make monthly prepayments of $5 million for five years. ARCO does not dispute that royalties have not been

- 19 -

paid on the value of these non-cash items. Thus, if such items constitute consideration for the settlement of ARCO's pricing claim, Lessors are entitled to a royalty on their fair market value. Producers such as ARCO cannot escape the duty to pay royalties merely by disguising the form of consideration received in the settlement of pricing disputes. This is true irrespective of the collateral benefits the items have conferred upon Lessors.

In Yates, we concluded that "there exists a genuine issue of material fact whether the . . . settlement proceeds are attributable solely to take-or-pay deficiencies (i.e., non-production), or whether they are attributable, at least in part, to a price adjustment for the actual production of gas." 98 F.3d at 1235. Similarly, in this case, we conclude that there is a genuine issue of material fact whether the settlement proceeds received by ARCO are attributable solely to the resolution of collateral disputes (i.e., the Mississippi Canyon) or whether they constitute payment, at least in part, for ARCO's agreement to compromise its pricing claim for gas actually produced and sold from the Wilburton Field. Although the district court concluded that none of the settlement proceeds were related to the production and sale of gas, the record does not allow us to rule out such a finding. We therefore reverse the grant of summary judgment in favor of

ARCO on the royalty issue and remand to the district court for further proceedings on this question.[3]

## II. ARCO'S DUTY TO OBTAIN THE HIGHEST PRICE AVAILABLE

Lessors argue that ARCO breached the implied covenant to market by failing to obtain the highest price available for Lessors' gas. The district court granted summary judgment to ARCO on this claim because the court found that Lessors could not show that the settlement price of $2.20 per MMbtu was not the highest market price available to ARCO at the time of the 1989 Settlement Agreement. The district court held that because ARCO obtained the best price available, ARCO acted prudently and with due diligence in marketing the gas.

Lessors argue on appeal that the district court erred in granting summary judgment to ARCO because the court reached its conclusion by resolving a genuine dispute of material fact. Lessors contend that a genuine factual dispute exists regarding whether ARCO's decision to settle its pricing claim satisfies the

---

[3] In addition to their claim for breach of the contractual duty to pay royalties, Lessors contend that ARCO's failure to pay royalties on the settlement proceeds constitutes a breach of the implied covenant to market gas, breach of the duty of good faith, breach of fiduciary duty, and unjust enrichment. In view of our holding that Lessors may (depending on the facts) have a contractual right to royalties on at least some portion of the settlement proceeds, we need not address Lessors' alternative claims. We see nothing in these claims that would "enlarge upon [Lessors'] contractual royalty rights." Yates, 98 F.3d at 1237 n.12; see also Cannon v. Cassidy, 542 P.2d 514, 516 (Okla. 1975) (failure to pay royalties does not constitute a separate breach of the implied covenant to market).

implied covenant to market. In particular, Lessors contend that a reasonable jury could find that ARCO breached the implied covenant to market by entering into the settlement agreement and accepting a price for gas lower than the price ARCO should have received under its gas supply contract with Arkla.

Under Oklahoma law, a producer such as ARCO has the "duty to market the gas produced from a well and to obtain the best price and terms available." Barby v. Cabot Corp., 550 F. Supp. 188, 190 (W.D. Okla. 1981) (citing Tara Petroleum Corp. v. Hughey, 630 P.2d 1269, 1273 (Okla. 1981)). In marketing the gas and obtaining the best price available, ARCO must exercise "that degree of diligence exercised by a prudent operator having regard for the interests of both the lessor and lessee." Fisher v. Grace Petroleum Corp., 830 P.2d 1380, 1391 (Okla. Ct. App. 1991). Lessors bear the burden of proving that ARCO violated this duty. Barby, 550 F. Supp. at 190; Tara Petroleum Corp., 630 P.2d at 1274.

To prevail on their claim at trial, Lessors initially must show that a higher price was available at the time of the settlement agreement. To survive a motion for summary judgment, therefore, Lessors must "set forth specific facts showing that there is a genuine issue for trial" regarding whether the $2.20 price was the best available price for their gas. Applied Genetics Int'l v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990). Although not entirely clear from the record, it appears that Arkla may have been obligated to pay the NGPA § 103

price for Lessors' gas. Indeed, this is what ARCO alleged in its lawsuit against Arkla in Oklahoma state court. Under the 1989 Settlement Agreement, however, ARCO agreed to a price below the § 103 price.

ARCO asserts that given the actual quality of the gas sold, ARCO could not have charged the § 103 price under the contract. Thus, ARCO maintains that its decision to settle with Arkla for the $2.20 price satisfied its duty to market the gas in a prudent manner.

While ARCO's ultimate decision to settle may have been a prudent business decision, we cannot say as a matter of law that ARCO has satisfied the implied covenant to market. Viewing the evidence and drawing all inferences in favor of Lessors as the nonmoving party, we conclude that Lessors have shown facts which support their contention that ARCO was entitled to receive the higher NGPA § 103 price. In particular, Lessors have shown that ARCO's existing contract required Arkla to purchase gas from the Wilburton Field at the § 103 price. ARCO admits that whether Arkla was obligated to pay the higher § 103 price under the purchase contract was a "hotly contested" issue during the 1989 settlement negotiations. If ARCO was entitled to receive the higher NGPA § 103 price from Arkla (which appears to depend on the quality of the gas), then ARCO's decision to settle for the $2.20 price may have breached its duty to market the gas and obtain the best price available. We therefore reverse the grant

of summary judgment to ARCO on this claim and remand to the district court for further proceedings.

## III.  THE DRAINAGE CLAIM

Finally, Lessors argue that ARCO failed to protect their units against drainage.  The district court granted summary judgment to ARCO on this issue because it found that a prior decision of the Oklahoma Corporation Commission bars Lessors' claim.

### A.    Implied Covenant to Protect Against Drainage

Under Oklahoma law, all oil and gas leases contain the implied covenant to develop a lease as a prudent operator, which includes "a duty to protect against drainage by the lessee's other operations."  Leck v. Continental Oil Co., 800 P.2d 224, 228 (Okla. 1989) (quoting Samson Resources Co. v. Corporation Comm'n, 702 P.2d 19, 23 (Okla. 1985)).  Normally, the duty to protect against drainage requires the lessee to drill an offset well on the lessor's land or pay damages to the lessor to compensate for gas being drained by adjacent wells.  See Leck, 800 P.2d at 227.  Thus, an action for drainage is proper where a lessee operates wells on the adjacent tracts in such manner as to "get a larger share" of the minerals beneath the leased premises or "to favor one lessor at the expense of another."  Id. (quotation omitted).  Under Oklahoma law, the failure to protect against drainage, under appropriate facts, "may be more than just a breach of the contract

(lease), but could amount to a tortious act." Id. (citing Morriss v. Barton, 190 P.2d 451, 457 (Okla. 1947)).

**B.     Effect of the OCC Field Rules**

In this case, the district court did not separately address the merits of Lessors' various theories of liability in support of their drainage claim. Instead, the district court held that Lessors' drainage claim was barred by the "governmental regulations" clause in their leases with ARCO. This clause states:

> This lease shall not be terminated, in whole or in part, nor shall lessee be held liable in damages, for failure to comply with the express or implied covenants hereof, if compliance therewith is prevented by, or if such failure is the result of any Federal or State laws, executive orders, rules or regulations.

App't. App. at 99. The district court concluded that any failure by ARCO to protect Lessors from drainage was caused by ARCO's compliance with the OCC Field Rules. The court noted that under the Field Rules, ARCO had until the end of 1991 "to adjust any over and under production." Because ARCO performed the workovers "in conformity with" the Field Rules, the court held that the governmental regulations clause excused ARCO from any potential liability for failure to comply with the covenant to protect against drainage. In so holding, the court relied on Fransen v. Conoco, Inc., 64 F.3d 1481 (10th Cir. 1995).

We disagree that the governmental regulations clause bars Lessors' claim against ARCO for breach of the implied covenant to protect against drainage.

While we recognize that "the express provisions of an oil or gas lease may negate or modify the lessee's implied covenants," Fransen, 64 F.3d at 1488, we conclude that the provisions of the Field Rules did not prevent or render impossible ARCO's compliance with its duty to protect against drainage. Although the Field Rules may have allowed ARCO to perform the workovers, nothing in the Field Rules excused ARCO from liability for drainage caused by the workovers. Put differently, the Field Rules neither commanded ARCO's selective performance of workovers nor precluded ARCO from taking action with respect to Lessors' wells to prevent the alleged drainage from occurring. As such, the Field Rules did not prevent ARCO's compliance with its implied duty to protect Lessors' units against drainage.

We do not read Fransen as broadly as the district court. In Fransen, several lessors alleged that their lessee breached the covenant to protect against drainage by failing to drill an offset well on their property. Fransen, 64 F.3d at 1484-85. The lessee defended on the basis that the OCC had specifically denied permission to drill a second well on the lessors' land, excusing the lessee from any liability resulting from its failure to drill an additional well. Id. at 1488. We held that the lessors' drainage claim was barred because the OCC decision "prevented compliance with any duty the defendants might otherwise have had to drill an

offset well" and because "a prudent operator would not drill a well that was prohibited by law." Id.

ARCO contends that Fransen bars Lessors' drainage claim in this case because ARCO's workover operations, as the district court put it, "equate[d] with compliance with . . . the Field Rules." Watts v. Atlantic Richfield Co., No. 95-339-S, slip op. at 13 (E.D. Okla. Jan. 11, 1996). Mere compliance with a governmental regulation, however, is insufficient to satisfy the standard contained in a governmental regulations clause. Fransen makes clear that to satisfy this standard, the governmental regulation at issue must preclude a lessee from performing the sought-after relief. In Fransen, an OCC decision specifically prevented the drilling of an offset well. Unlike the situation in Fransen, nothing in the Field Rules prevented ARCO from taking steps to protect Lessors' units from drainage. More importantly, nothing in the Field Rules sanctioned the selective performance of workovers on some wells thereby causing drainage from other wells operated by the same lessee. Because Fransen is not so broad as to bar Lessors' claim for drainage, we reverse the grant of summary judgment in favor of ARCO and remand for further proceedings.

## CONCLUSION

Having reviewed the record and found that a genuine issue of material fact exists regarding Lessors' claim for royalties, we REVERSE the grant of summary

judgment to ARCO and REMAND this claim to the district court to determine which portions of the settlement, if any, are attributable to the resolution of collateral disputes (and thus are not royalty bearing), and which portions are attributable to ARCO's settlement of past and future pricing deficiencies (and thus are royalty bearing to the extent that the payment is linked to actual production). We also REVERSE the grant of summary judgment to ARCO on Lessors' claims for failure to obtain the highest available price and REMAND for further proceedings to determine whether ARCO violated the implied covenant to market. Finally, we REVERSE the grant of summary judgment to ARCO on Lessors' claim for failure to protect against drainage and REMAND this claim for further proceedings consistent with this opinion.