2013 OK 104

**H.B. KRUG, Kathryn Krug, and Bobbie Ruth Eubanks, on behalf of themselves and on behalf of a class of similarly situated owners, Plaintiffs/Appellees,**

v.

**HELMERICH & PAYNE, INC., a Delaware Corporation, Defendants/Appellant.**

No. 106845.

Supreme Court of Oklahoma.

Dec. 10, 2013.

As Corrected Feb. 24, 2014.

Rehearing Denied Feb. 24, 2014.

Terry J. Barker, Joseph C. Woltz, Gene G. Boerner, Robert N. Lawrence, Pezold, Barker, & Woltz, Tulsa, Oklahoma, Allan DeVore, The Devore Law Firm, P.C., Oklahoma City, Oklahoma, and Douglas E. Burns, Terry L. Stowers, Daniel Wayne Peyton, Burns & Stowers, P.C., Norman, Oklahoma, for Appellees.

John E. Dowdell, Ryan A. Ray, Norman, Wohlgemuth, Chandler, and Dowdell, Tulsa, Oklahoma, Clyde A. Muchmore, Mark S. Grossman, Crowe & Dunlevy, Oklahoma City, Oklahoma, and Daniel M. Reilly, Eric Fisher, Reilly Pozner, LLP, Denver, Colorado, for Appellant.

Steven R. Welch, Justin E. Porter, Nathaniel S. Mattison, Oklahoma City, Oklahoma, for Amicus Curiae, Devon Energy Production Company, L.P.

John L. Randolph, Randall G. Vaughan, Pray, Walker, P.C., Tulsa, Oklahoma, for Amicus Curiae, Oklahoma Independent Petroleum Association.

WINCHESTER, J.

¶ 1 Helmerich & Payne, Inc. (H & P) appeals a judgment in favor of the plaintiffs, who are a class of oil and gas royalty owners. The jury returned verdicts on three alternative theories of recovery. The trial court judge granted judgment that included disgorgement of profits based on a sum the trial court found unjustly enriched H & P. On appeal, the Court of Civil Appeals affirmed in part and reversed in part, and remanded with instructions. We granted certiorari.

## I. FACTS

¶ 2 The plaintiffs/appellees, H.B. Krug, Kathryn Krug, and Bobbie Ruth Eubanks, brought this class action against H & P. The class consists of the owners of minerals underlying two 640–acre sections of land, the Littauer and Copeland sections in Beckham County, Oklahoma. The plaintiffs leased the two sections to H & P, which operated natural gas wells on those sections from 1978 to 1998, when H & P sold its interests to a third party.

### A. Defendant's Summary of Facts

¶ 3 The defendant's summary of the record includes the following. In the 1970s ANR Pipeline Company negotiated separate "take-or-pay" contracts [1] with each working interest owner in the Littauer section to purchase

---

1. A take-or-pay contract with a gas purchaser obligates the purchaser to take and pay for a minimum amount of gas for a contractual period. If that quantity of gas is not taken from the well, the purchaser nevertheless contracts to pay for that minimum amount of gas (a deficiency payment). Amounts of gas not taken but paid for may be taken from the well free of additional payment at any subsequent time within the contractual period. The seller must repay the buyer for all gas paid for but not taken at the time the contract terminates or the gas reserves are depleted. *Golsen v. ONG Western, Inc.,* 1988 OK 26, ¶ 2, 756 P.2d 1209, 1210.

and transport 100% of the gas produced in that section through interstate pipelines. In the Copeland section ANR entered into take-or-pay contracts with all the working interest owners except Conoco, which contracted to sell its 50% share to an intrastate pipeline owned by Oklahoma Natural Gas. The working interest owners appointed H & P as operator of the Littauer and Copeland wells, which began producing in the late 1970s from the Hunton natural gas reservoir.

¶ 4 Beginning in the early 1980s events including a national recession and a deregulation of the natural gas market resulted in an oversupply of natural gas. ANR's largest customer announced it would severely reduce its purchases. In May 1985 ANR severely reduced its natural gas purchases and, relying on the *force majeure* clauses in its contracts, refused to either take or pay for agreed quantities of gas. In October H & P brought take-or-pay claims against ANR. H & P also sought a release from its take or pay contract with ANR for the Littauer and Copeland wells and drilled and bore 60% of the cost of a second well. It additionally constructed and paid nearly all costs of constructing a pipeline to connect the Littauer No. 1 well to an ONG pipeline at a neighboring well. In April 1988 H & P added new claims to its take-or-pay lawsuit, including a ratable take[2] claim that ANR was causing uncompensated drainage by refusing to take gas from H & P in proportion to other working interest owners. In December 1988 H & P filed a response to ANR's discovery requests from an H & P geologist who estimated that uncompensated drainage was occurring from the Littauer and Copeland sections. Subsequently, during the trial an H & P senior vice president testified that after review, the geologist's estimates were unsupportable and speculative causing him and

ANR to dismiss the drainage claim as having no value.

¶ 5 In October 1989 H & P settled its take-or-pay lawsuit with ANR covering 98 wells for a net amount of $17,205,017. H & P calculated that the total damages for the take-or-pay and contract buyout of the Littauer and Copeland wells for H & P's 15.4% interest in the Littauer was $109,582.40 and for the Copeland the amount was $161,220.32. H & P asserts that it never calculated a monetary damage figure for the uncompensated drainage alleged in the lawsuit and it was never a part of the settlement discussions with ANR. As expressly stated in the take-or-pay settlement agreement, ANR's payment was in satisfaction of H & P's take-or-pay claims, contract price claims and as consideration for the termination of the contracts, not for uncompensated drainage.

### B. Plaintiffs' Summary of Facts

¶ 6 The plaintiffs alleged that H & P breached its duties to them by failing to act as a reasonably prudent operator and by allowing uncompensated drainage of natural gas to occur from these two sections beginning January 1, 1982, and ending December 31, 1989. The plaintiffs also alleged that H & P received payment for uncompensated drainage through the October 31, 1989, take-or-pay settlement with ANR, which was responsible for carrying the gas from the two sections leased to H & P. They also alleged that H & P concealed the settlement from the royalty interest owners and that the plaintiffs and the class are entitled to a share of that settlement, in addition to all profits H & P obtained from what should have been paid to the royalty owners. The plaintiffs further alleged that H & P's conduct involved fraud, that H & P has been unjustly enriched

---

**2.** "[R]atable taking is defined as the proportion which the natural flow of gas from the wells of one producer bears to the amount of the natural flow from the wells of the owners producing from the same common source of supply or common reservoir." *Anderson v. Dyco Petroleum Corp.*, 1989 OK 132 ¶ 16, 782 P.2d 1367, 1376. Title 52 O.S.2011, § 233 provides: "Any person, firm or corporation, taking gas from a gas field, except for purposes of developing a gas or oil field, and operating oil wells, and for the purpose

of his own domestic use, shall take ratably from each owner of the gas in proportion to his interest in said gas, upon such terms as may be agreed upon between said owners and the party taking such, or in case they cannot agree at such a price and upon such terms as may be fixed by the Corporation Commission after notice and hearing; provided, that each owner shall be required to deliver his gas to a common point of delivery on or adjacent to the surface overlying such gas."

as a result, and that in addition to their actual damages, they should receive punitive damages.

### C. Defendant's Response to Plaintiffs' Claims

¶ 7 H & P denied the allegations and asserted that it had paid all the royalty interest owners all they were entitled to receive. It also claims it had served as a reasonably prudent operator throughout the time period that the plaintiffs claim uncompensated drainage occurred. It denies that its take-or-pay settlement with ANR Pipeline included an amount for uncompensated drainage. Finally, it claimed that the plaintiffs were barred by the applicable statute of limitations.

### D. Trial and Verdict

¶ 8 In alternative claims, the jury returned its verdict in favor of the plaintiff class, awarding $3,650,000 for breach of the implied duty to prevent uncompensated drainage, $4,055,000 breach of fiduciary duty for failure to prevent uncompensated drainage, and $6,845,000 for constructive fraud in the ANR settlement. The jury also found that H & P had been unjustly enriched. The jury verdict form stated that the jury did not "find by clear and convincing evidence that the Defendant acted in reckless disregard for the rights of others," and the jury did not "find by clear and convincing evidence that the Defendant acted intentionally and with malice toward others."

¶ 9 Regarding the $6,845,000 for constructive fraud in the ANR settlement, the trial court held a second-stage hearing for the jury to determine the amount of the gross profit H & P made on $6,845,000 that H & P had held since October 31, 1989. In this disgorgement stage, the plaintiffs presented the annual reports and the files with the Securities Exchange Commission along with testimony to show how much the plaintiffs and the class would have made had they invested the amount in H & P. The amount

the jury awarded for disgorgement of profits was $61,662,000.

¶ 10 The trial court stated in its "Corrected Final Judgment *Nunc Pro Tunc*" of January 29, 2009, that it had previously ruled that the verdicts on the plaintiffs' claims for unjust enrichment and for disgorgement of profits would be treated as advisory. The court adopted the verdicts of the jury, independently agreeing with the verdicts and based on the same evidence and instructions of law considered by the jury. The court then found in favor of the plaintiffs on their claims, but found their award for disgorgement of profits should be increased to $112,677,750.[3] To that amount, the court added the damages of $6,845,000 and set the total amount awarded against H & P as $119,522,750. The court also awarded interest on $6,845,000, at the rate provided for by law from the date of rendition of November 21, 2008, and interest on the remaining $112,677,750, at the rate provided for by law from the date of rendition of January 8, 2009, until paid in full. Finally, the court ordered that plaintiffs be awarded their costs and attorney fees.

## II. DISCUSSION

¶ 11 As described in the facts above, at the conclusion of the trial, the court instructed the jury on three alternative theories for recovery of damages by the plaintiffs, (1) a legal remedy based on the implied duty to protect against drainage, which is a contract theory; (2) a legal remedy based on fiduciary duty of a lessee toward the lessors; and (3) an equitable remedy based on constructive fraud and unjust enrichment. Juror Instruction No. 34 informed the jury that they were to consider each of the claims separately. Other instructions revealed that none of the three claims could exceed the amount of $10,969,217 for damages. Instruction No. 34 also informed the jury that damages were not to be apportioned between the different claims or reduced under one claim where the jury had awarded damages under another

**3.** The plaintiffs' financial expert testified that H & P would have profited $112,677,000 on the $6,845,000 found by the jury to be damages on the unjust enrichment claim. That amount was

calculated from the date of the ANR settlement to the date of the expert's testimony, November 25, 2008. (Tr. 2857)

claim. The instruction continued that the court would decide the claim on which the judgment would be entered. Because the jury needed some clarification on these instructions, the trial court orally instructed the jurors that the claims would not be added together to reach a final judgment. The written instructions with the in-court clarification explained that only one judgment on damages would be entered.

¶ 12 When the jury returned its verdicts on the alternative theories, the jury found (1) in favor of the plaintiffs on their contractual claim of a breach of the implied duty to prevent uncompensated drainage and set the damages at $3,650,000; (2) in favor of the plaintiffs on their claim of breach of fiduciary duty to prevent uncompensated drainage and set the damages at $4,055,000; and (3) in favor of the plaintiffs on their claim of constructive fraud in the ANR settlement and set the damages at $6,845,000. In the verdict form the jury also found in favor of the plaintiffs on their claim of breach of fiduciary duty; and found the defendant was enriched by retaining a portion of the ANR settlement. Regarding reckless disregard of the rights of others and acting intentionally and with malice towards others, the jury found in favor of the defendant. Accordingly, the jury did not award punitive damages. On a separate verdict form during the second stage of trial, the jury, having already found unjust enrichment, found in favor of the plaintiffs and awarded an amount for disgorgement of profits made by the defendant on the $6,845,000 previously awarded and awarded an additional sum of $61,662,000. Because this was a verdict based on equity, the court took the amount as advisory and added to that amount for a disgorgement award of $112,677,750. The damages plus the amount of unjust enrichment brought the total award to $119,522,750.

### A. Fiduciary Duty to Prevent Uncompensated Drainage

■ ¶ 13 On the verdict form, Section 2, the trial court submitted the following option to the jury, "We the jury, duly empanelled and upon our oaths, find in favor of the Plaintiff [Class] on Plaintiff's claim of breach of fiduciary duty to prevent uncompensated drainage." The form has YES check marked and the jury foreperson signed it, indicating the jury unanimously agreed. Jury Instruction No. 20 is entitled "BREACH OF FIDUCIARY DUTY–EXISTENCE OF FIDUCIARY RELATIONSHIP" and it provides:

"You must determine whether a fiduciary relationship existed in this case between the Plaintiff Class and the Defendant based upon their relationship and the other circumstances in this case. A fiduciary relationship exists whenever trust and confidence are reasonably placed by one person in the integrity and loyalty of another, and the other person knowingly accepts that trust and confidence and then undertakes to act on behalf of the person."

The instructions cite as authority Oklahoma Uniform Jury Instructions 26.2. The trial court used the third alternative found in the instruction. It provides: "The third alternative should be used where the existence of a fiduciary relationship is a jury question and the fiduciary relationship does not fit into a well-defined category, such as the relationship of a guardian and ward." The plaintiffs argue that because this is a factual issue it must be affirmed if supported by any competent evidence.

■ ¶ 14 The courts have generally refrained from defining the particular instances of fiduciary relationship to such a degree that new cases might be excluded. The expression "fiduciary or confidential relationship" has a broad meaning and includes technical relations and informal relations in which one person trusts and relies on another. *Sellers v. Sellers*, 1967 OK 34, ¶ 21, 428 P.2d 230, 236. That relationship may arise by kinship between the parties, or professional, business, or social relations that would reasonably lead an ordinary prudent person in the management of business affairs to repose a degree of confidence that largely results in the substitution of the will of the defendant for that of the plaintiff in the material matters involved in a transaction. *Sellers,* 1967 OK 34, ¶ 21, 428 P.2d at 236.

■ ¶ 15 However, the law regarding fiduciary obligation to prevent drainage in Oklahoma oil and gas law is settled. *Howell*

*v. Texaco, Inc.*, 2004 OK 92, ¶ 26, 112 P.3d 1154, 1161, reaffirmed that a producer's liability is purely a contractual one and in no sense fiduciary.[4] A royalty lease alone does not create a fiduciary duty. *Howell*, 2004 OK 92, ¶ 28, 112 P.3d at 1161. *Leck v. Continental Oil Co.*, 1989 OK 173, ¶ 18, 800 P.2d 224, 229, recognizes an exception to this rule. A unit operator in a unitized section owes a fiduciary duty to the royalty owners and lessees who are parties to the unitization agreement or order creating the unit. The duty is not created by the lease agreement but rather by the unitization order and agreement.[5] Unitization is not an issue in the class action lawsuit that is now before this Court.

■ ¶ 16 *Howell* included wells that were in voluntarily communized areas. *Howell*, 2004 OK 92, ¶ 5, 112 P.3d at 1157. Communitization agreements are distinguishable from unitization orders because they are contracts and, unlike unitization orders, do not impose any greater obligations on a lessee than a lease does; they do not create a fiduciary duty on the lessee. *Howell*, 2004 OK 92, ¶ 25, 112 P.3d at 1160.

¶ 17 *Howell* adds that this Court had refused to find an operator owed a fiduciary duty to an overriding royalty interest owner based solely on the lease. *Howell*, 2004 OK 92, ¶ 27, 112 P.3d at 1161, citing *Goodall v. Trigg Drilling Co.*, 1997 OK 74, ¶ 11, 944 P.2d 292, 295. The concurring opinion in *Goodall* quotes *Kuntz, The Law of Oil and Gas*, § 48.3 in the context of discussing the lessee's duty of good faith in exercising its pooling power. Professor Kuntz asserts that the lessee is not a fiduciary; that standards applied to fiduciaries are entirely too strict. Kuntz reasons that this is true because the lessee is not managing and developing the

property for the sole benefit of the lessor. He explains that the lessee has substantial interests which must be taken into account and the lessee should not be required to subordinate its own interests entirely to the interests of the lessor. Kuntz continues that the lessee's interests frequently conflict with those of the lessor. When exercising its power in fairness and in good faith, the lessee is entitled to take into account both its interests and that of the lessor. *Goodall v. Trigg Drilling Co.*, 1997 OK 74, ¶ 6, 944 P.2d at 296 (concurring opinion).

■ ¶ 18 Because the law is long-standing and settled that a producer's liability is purely a contractual one and in no sense fiduciary, the trial court erred in presenting the jury with an instruction that permitted the jury to find that H & P owed a fiduciary duty to the plaintiffs to prevent uncompensated drainage. H & P's duty is contractual and based on its lease, and so the remedy should be based on the breach of contract.

"Where the lessee has breached an implied covenant to develop, to protect against drainage, to market, or to produce a well capable of production in paying quantities, the usual remedy is the recovery of damages for the breach. In most jurisdictions, damages are measured by royalties that the lessor would have received if the lessee had acted as a reasonable and prudent operator."[6] [Footnotes omitted.]

¶ 19 H & P is entitled to separate its interest from that of the plaintiffs. H & P does not owe undivided loyalty; there is no special trust as a manager or agent. The duty required by the implied covenant to protect against drainage is that required of a reasonable and prudent operator, not that of an agent to a principal, nor of a partner to a

---

4. Citing *Bunger v. Rogers*, 1941 OK ¶ 117, 5, 188 Okla. 620, 112 P.2d 361, 363. That Court observed: "The defendants were merely lessees under an oil and gas mining lease and were under no obligation to the plaintiff other than to pay the rent and royalty provided in said lease, and if they breached this duty, then their liability was purely a contractual one and in no sense fiduciary."

5. *Leck* cites *Young v. West Edmond Hunton Lime Unit*, 1954 OK 195, ¶ 19, 275 P.2d 304, 309,:

"The unit organization with its operator stands in a position similar to that of a trustee for all who are interested in the oil production either as lessees or royalty owners. The law applicable to this unitization required no notice to royalty owners, and afforded them no voice in the organization or management of the unit or in the selection of the unit operator."

6. Owen L. Anderson et al., *Hemingway Oil and Gas Law and Taxation* 440–441 (4th ed.2004).

partnership, nor of a trustee to a *cestui que trust*. Any former cases of this Court using terms suggesting a fiduciary duty of a lessee to its lessor should not be so construed.[7] This conclusion eliminates the second alternative found in the jury's verdict.

### B. Uncompensated Drainage and Net Flow of Gas

¶ 20 H & P asserts that the trial court erred in its instructions regarding uncompensated drainage, net flow of gas, and the reasonably prudent operator standard. H & P argues that the implied contractual covenant to prevent uncompensated drainage of gas from the leasehold must be proven by establishing two elements: (1) that substantial, uncompensated drainage of gas from the leasehold occurred; and (2) that the working interest owner failed to act as a reasonably prudent operator to prevent such drainage. H & P cites *Fransen v. Conoco, Inc.*, 64 F.3d 1481, 1490–91 (10th Cir.1995) and *Rogers v. Heston Oil Co.*, 1984 OK 75, ¶ 20, 735 P.2d 542, 546. H & P claims that the royalty owner must prove that drainage is uncompensated by establishing that the outflow of natural gas was not compensated by the inflow of gas, that is, counter-drainage, and again cites *Fransen*, 64 F.3d at 1490–91.

¶ 21 The *Fransen* plaintiffs, the lessors in that case, owned mineral interests in a drilling and spacing unit for the production of gas, which was located in Oklahoma. They sued the defendants alleging that as lessees, they had failed to protect and develop the lessors' interests. More specifically the lessors claimed that the lessees breached their implied covenants under the leases to fully develop the leases and to protect the leases from drainage. The lessors alleged that the lessees breached their obligation to act as prudent operators by failing to drill an additional well on the leased property. However, the Oklahoma Corporation Commission had previously denied an application to drill an additional well in the leased section. *Fransen*, 64 F.3d at 1484–85.

¶ 22 The *Fransen* court specifically refused to make the holding H & P asserts as the counter-drainage rule: "We need not decide whether Oklahoma would recognize as an abstract proposition that a party who has suffered drainage has been injured, regardless of whether the drainage has been compensated for by other drainage." *Fransen*, 64 F.3d at 1491. The Oklahoma Corporation Commission found that an additional well in the section belonging to the plaintiffs was unwarranted and would violate the rights of owners in other sections of the common source of supply. *Fransen*, 64 F.3d at 1485. The district court concluded the defendants' actions did not breach any implied covenant, and reasoned that the defendants could not be liable for failing to drill an additional well in a section where the OCC had determined that an additional well should not be drilled. *Fransen*, 64 F.3d at 1485. The Tenth Circuit affirmed the district court's decision. *Fransen*, 64 F.3d at 1495.

¶ 23 The Tenth Circuit in *Watts v. Atlantic Richfield Co.*, 115 F.3d 785 (10th Cir.1997), cited *Fransen* and stated the holding of that case as "the lessor's drainage claim was barred because the OCC decision 'prevented compliance with any duty the defendants might otherwise have had to drill an offset well,' and because 'a prudent operator would not drill a well that was prohibited by law.'" *Watts v. Atlantic Richfield Co.*, 115 F.3d at 796. *Fransen* certainly does not support the counter-drainage rule that H & P would have this Court recognize as controlling in this matter.

¶ 24 The rule cited by H & P, as stated in *Rogers v. Heston Oil Co.*, 1984 OK 75, ¶ 20, 735 P.2d 542, 546, provides:

> "[T]he lessee has a duty to protect the land from drainage by adjoining wells so long as the drilling of a protection well or wells will, in the judgment of a reasonably prudent operator, be a profitable undertaking, ... having due regard for the interests of

7. Cases that are distinguishable on their facts have used terms such as "agent," "trustee," or "fiduciary," but these should not be cited for the general proposition that Oklahoma recognizes a fiduciary duty between lessors and lessees in oil and gas law. *Cf. Probst v. Hughes*, 1930 OK 57, 143 Okla. 11, 286 P. 875; *Hivick v. Urschel*, 1935 OK 71, 171 Okla. 17, 40 P.2d 1077; and *Imes v. Globe Oil & Refining*, 1938 OK 601, 184 Okla. 79, 84 P.2d 1106.

both lessor and lessee." [Citation omitted.]

¶ 25 Like the *Fransen* case, *Rogers* was also a suit for breach of the implied covenant to protect from drainage, but unlike *Fransen* the lease had not been pooled with other leases owned by the defendants/lessees that were adjoining or adjacent to the plaintiff's lease. The defendants in the *Rogers* case completed a producing well on their adjacent lease 330 feet from the plaintiff's tract. The defendants subsequently drilled a dry hole on the plaintiff's tract, and later paid the plaintiff delay rental that was not yet due pursuant to the terms of the contract between the parties. About four months later, the plaintiff sued the defendants for breach of an implied covenant to drill a protective well against drainage from the adjacent lease. The trial court granted a motion for summary judgment in favor of the defendants.

¶ 26 The *Rogers* Court recognized the fundamental injustice of allowing the "prudent operator rule" to result in delay payments where the lessees operated an adjacent well and that existing well would draw oil from the lessor's tract without the lessees incurring the expense of a well to prevent drainage. *Rogers*, 1984 OK 75, ¶ 23, 735 P.2d at 546. The Court accordingly held that the acceptance of delay rentals with the lessor's knowledge that oil and gas was being drained from the lessor's premises at the time payment does not constitute a waiver of the lessor's right to recover damages for such drainage. And in addition, where the lessee is the owner of an adjoining lease that is draining the lessor's tract, the prudent operator rule must be applied to determine whether the lessee would drill a protection well on the lessor's tract if the draining lease were owned by a third party. *Rogers*, 1984 OK 75, ¶ 25-26, 735 P.2d at 547.

¶ 27 The *Rogers* Court quoted 38 Am. Jur.2d Gas and Oil, § 126, that the law concerning the implied covenant to protect the leasehold against drainage does not require the lessee to do more than would be done by a prudent operator acting under the same circumstances. There is no relation of special trust or confidence between the lessor and lessee in a gas and oil lease any more than there is in any other type of lease, so that a court of equity should not interfere in the determination of the necessity and propriety of sinking a well to prevent drainage where that question is a business judgment. The lessee should not be required to work unprofitably even for the profit of the lessor, so that the lessee is not required to sink wells to offset drainage from wells on adjoining premises where the production from the wells would be slight and will never return the cost of drilling. The lessee has no implied right to use proximately located wells to drain its lessor's tract. The lessee must take protective action by drilling the necessary number of offset wells as though the developed leasehold were being operated by a third party. *Rogers*, 1984 OK 75, ¶ 30, 735 P.2d at 547–548.

¶ 28 The facts of the matter now before this Court and admitted by H & P reveal that ANR Pipeline Company negotiated contracts with working interest owners in the Littauer and Copeland 640-acre sections in Beckham County. In May 1985, ANR reduced its natural gas purchases, declared "force majeure" under its contracts and refused to take or pay for agreed quantities of gas. H & P characterizes its subsequent lawsuits as take-or-pay claims against ANR and in April 1988 H & P added new claims that ANR was causing uncompensated drainage by refusing to take gas from H & P in proportion to that being taken by other working interest owners. H & P settled for a net amount of $17,205,017.

¶ 29 In *Roye Realty & Developing v. Watson*, 1996 OK 93, 2 P.3d 320, the Court considered whether royalty was owed a lessor when the lessee settled a take-or-pay lawsuit with the buyer of the gas. Like the case now before this Court, the settlement was confidential. The *Roye* Court observed that the lessors, pursuant to their lease agreement with the lessee, were entitled to royalties on gas produced and sold or used off the leased premises, or gas produced saved and sold from the premises. The Court relied on the lease agreement and held that under Oklahoma law the royalty owner was not entitled to share in take-or-pay settlements absent clear language to the con-

trary in the lease. *Roye*, 1996 OK 93, ¶ 33, 2 P.3d 320, 329. To distinguish *Roye* from the case now before us, the plaintiffs in this case alleged that the settlement included payment for uncompensated drainage.

¶ 30 H & P argues that Instruction Number 16 is erroneous. It instructed "Drainage occurs when an oil and gas unit is operated in such a way that oil or gas that would otherwise have been produced from that well is drained away by other wells." The second paragraph instructed "The drainage is uncompensated where the injured party does not receive offsetting income from an interest in the draining well." H & P and the amici briefs wish this Court to accept a rule that the jury should have considered "net flow" of gas; and that is whether the outflow of natural gas was not compensated for by counter-drainage, the inflow of gas. H & P asserts that because of the inflow of gas, the plaintiffs actually received more in royalties than the original estimates of gas underlying the leases.

¶ 31 From the facts presented by H & P, its settlement was based on a time period where there would not have been an outflow of gas because ANR was not taking gas at that time. The authorities cited by H & P as supporting its view are factually dissimilar and therefore distinguishable. The plaintiffs' claims included what they alleged to be their contractual share of the royalties from the settlement between H & P and ANR. The jury determined the plaintiffs' share and awarded that amount. Instruction Number 16 cites *Feely v. Davis*, 1989 OK 163, 784 P.2d 1066 as its authority and we agree that the instruction fairly represents the law as stated in *Feely*. Net flow of gas is not a proper consideration given the facts of this case.

## C. Plaintiffs' Alternative, Equitable Claims

■ ¶ 32 The plaintiffs alternatively recast their contractual claim as equitable, quasi-

contract claims for constructive fraud and unjust enrichment seeking disgorgement of profits. Constructive fraud is defined by statute, 15 O.S.2011, § 59.[8] Jury instruction number 23 provided that "Constructive fraud consists of any breach of duty which, without an actually fraudulent intent, gained Defendant an advantage by misleading the plaintiff representatives to their prejudice." Jury instruction number 31 covers reckless disregard of another's rights and instructed in part: "In order for the conduct to be in reckless disregard of another's rights, it must have been unreasonable under the circumstances, and also there must have been a high probability that the conduct would cause serious harm to another person." The jury found in favor of the defendant. Jury instruction Number 31 also defined malice: "Malice involves either hatred, spite or ill-will, or else the doing of a wrongful act intentionally without just cause or excuse." The jury again found in favor of the defendant. We may conclude from this verdict form that the jury was not persuaded H & P's conduct was in reckless disregard of the plaintiffs' rights, nor was it caused by hatred, spite, ill-will or intentionally wrongful.

¶ 33 In *Anderson v. Copeland*, 1963 OK 34, 378 P.2d 1006, the plaintiff sued to recover for the rental value of a tractor owned by the plaintiff and which had been in possession of the defendant for two weeks. The defendant had contracted to buy the tractor but was unable to finance it and returned it to the plaintiff. The defendant argued that an express contract and an implied contract between the same parties covering the same subject matter cannot exist. The Court explained that such statement of law was not applicable because the subject matter of the express contract was a sale, whereas the subject matter of the contract implied in law was a rental. *Anderson v. Copeland*, 1963 OK 34, ¶ 7, 378 P.2d at 1007. This case illustrates how equitable remedies are in-

**8.** "Constructive fraud consists:
"1. In any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault, or any one claiming under him, by misleading another to his prejudice, or to the prejudice of any one claiming under him; or,

"2. In any such act or omission as the law specially declares to be fraudulent, without respect to actual fraud."

tended to provide justice where no legal remedies exist.

■ ¶ 34 The long-standing rule in Oklahoma is that a plaintiff may not pursue an equitable remedy when the plaintiff has an adequate remedy at law. *Harvell v. Goodyear Tire & Rubber Co.*, 2006 OK 24, ¶ 18, 164 P.3d 1028, 1035. "[W]here the plaintiff has a plain, speedy and adequate remedy at law, equity will not intervene in his behalf." *Robertson v. Maney*, 1946 OK 59, ¶ 7, 166 P.2d 106, 108. A claim for breach of contract provides such a remedy.

■ ¶ 35 Parties initiate contracts to provide a degree of certainty in their business transactions. The courts cannot make a better contract for the parties than they executed themselves. *Roye Realty & Developing, Inc. v. Watson*, 1996 OK 93, ¶ 33, 2 P.3d 320, 329. The essential principle of contract law is the consensual formation of relationships with bargained-for duties. The obvious corollary is bargained-for liabilities for failure to perform those duties. "Important to the vitality of contract is the capacity voluntarily to define the consequences of the breach of a duty before assuming the duty." *Isler v. Texas Oil & Gas Corp.*, 749 F.2d 22, 23 (10th Cir.1984).

■ ¶ 36 In this case, the plaintiffs relied upon, enforced and were awarded damages in the amount of $3,650,000 based on a breach of valid lease contracts they held with H & P. The plaintiffs claimed that a part of the take-or-pay settlement was for the implied contractual duty to protect against drainage.

"An implied covenant must rest entirely on the presumed intention of the parties as gathered from the terms as actually expressed in the written instrument itself, and it must appear that it was so clearly within the contemplation of the parties that they deemed it unnecessary to express it, and therefore omitted to do so, or it must appear that it is necessary to infer such a covenant in order to effectuate the full purpose of the contract as a whole as gathered from the written instrument."

*Danciger Oil & Refining Co. of Texas v. Powell*, 137 Tex. 484, 154 S.W.2d 632, 635 (1941).

■ "[A]ll implied lease covenants stem from a single duty of the lessee to act in good faith as a reasonable and prudent operator...."[9] The implied covenant to protect against drainage has long been recognized as fitting within this category.[10]

¶ 37 The jury's award for the breach of that implied contractual duty satisfies that claim. That award afforded the plaintiffs an adequate remedy at law and, as such, the plaintiffs' alternative, equitable claims cannot be recognized.

### D.   Statute of Limitations

■ ¶ 38 H & P argues that the implied covenant to protect against drainage is barred by the five-year statute for actions on a written contract. 12 O.S.2011, § 95(A)(1). Jury Instruction No. 27, entitled "STATUTE OF LIMITATIONS–BREACH OF THE IMPLIED DUTY TO PREVENT UNCOMPENSATED DRAINAGE, informed the jury that the date the plaintiffs filed this claim was December 22, 1998, and that the statute of limitations required that it be filed within five years of December 31, 1989. The instruction continued that if the plaintiff class did not file its claim within five years of December 31, 1989, the jury must find that the claim was barred by the statute unless it was tolled by the concealment exception stated in Instruction 32.

¶ 39 Instruction No. 32 informed the jury that the concealment exception defense applied if the plaintiffs were unable to file any claim because the defendant misled the plaintiffs by concealing facts. The instruction added that if the jury found by the greater weight of the evidence that the defendant engaged in false, fraudulent or misleading conduct or some affirmative act of concealment to exclude suspicion and preclude inquiry, which prevented the plaintiffs from timely bringing a claim, the claim was not barred by the statute of limitations. As authority, the

---

9.  Owen L. Anderson et al., *Hemingway Oil and Gas Law and Taxation* 402 (4th ed.2004).

10.  Richard W. Hemingway, *The Law of Oil and Gas* 411 (2d ed.1983),

trial court cited *Jarvis v. City of Stillwater*, 1987 OK 5, ¶ 4, 732 P.2d 470, 473.

¶ 40 *Jarvis* recognizes that a defendant is estopped from interposing the defense of a time bar when the defendant's conduct has induced the plaintiff to refrain from timely bringing an action because of the defendant's false, fraudulent or misleading conduct or some act that induces the plaintiff to refrain from timely bringing the action. This is a fact question. *Jarvis*, 1987 OK 5, ¶ 4, 732 P.2d at 472–473. The plaintiffs had provided evidence to prove that H & P never disclosed to the royalty owners the drainage or payments from ANR, and that H & P concealed these facts by a settlement agreement that was kept secret from its own employees. The plaintiffs also alleged that the reason given by H & P for keeping the terms secret was to prevent royalty owners from bringing a lawsuit.

¶ 41 Plaintiff's Exhibit 117 is an inquiry to H & P, dated October 1, 1996, on behalf of royalty owners asking H & P for copies of any and all gas purchase contracts and any settlements involving resolution of any claims H & P sought against the purchaser of gas for the two wells at issue. Plaintiff's Exhibit 118 reveals that on October 25, 1996, H & P responded it was their policy not to make available copies of gas purchase contracts and that the company was unaware of any applicable law that would required release of that type of information to their firm, Royalty Auditing Inc. On October 2, 1997, Plaintiff's Exhibit 185, a law firm representing the named plaintiffs, Krug and Eubanks, demanded, among other things, an accounting regarding drainage of gas, and asked for all documents regarding settlement of any drainage claims. H & P's attorney responded that it "has never received any settlement from its gas purchasers relating to any alleged drainage of gas reserves from the above described wells." Plaintiff's Exhibit 187. These exhibits were thoroughly addressed in testimony during the trial. The jury had this evidence before it and it could reasonably conclude that uncompensated drainage occurred. "[T]he sufficiency of the evidence to sustain a judgment in a law action will be determined in the light of the evidence tending to support the same, together with every reasonable inference deducible therefrom, rejecting all evidence adduced by the adverse party which conflicts with it." *Smith v. Davis*, 1967 OK 161, ¶ 6, 430 P.2d 799, 800–801. The concealment does not have to have been fraudulent to be false and misleading. There is ample evidence in this case to sustain a judgment.

## III. CONCLUSION

¶ 42 H & P asserts four reasons this Court should grant certiorari. The first claimed incorrect jury instructions for uncompensated drainage that barred consideration of counter drainage. We have answered that the jury based its verdict on the implied covenant to protect against drainage, which is a claim based on the lease agreement. Even though H & P argues that no drainage occurred, the jury verdict concluded that drainage occurred during the time H & P operated the wells and it was uncompensated. The jury set an amount for that claim. We do not find reversible error in the jury instructions. The jury set the damages at $3,650,000, and we will not reverse the jury's verdict.

¶ 43 The second reason for granting certiorari was that the Court of Civil Appeals allowed a breach of contract claim to be recast as an equitable unjust enrichment claim. We have answered that a plaintiff may not pursue an equitable remedy when the plaintiff has an adequate remedy at law. The jury found that the plaintiffs did not prove by clear and convincing evidence that H & P acted in reckless disregard for the rights of others, nor that H & P acted intentionally and with malice toward others. We have held that the lessee's duty to the plaintiffs/lessors, which is well recognized in the law of oil and gas, is to act in good faith as a reasonable and prudent operator. Breach of the duty to prevent uncompensated drainage is a breach of contract based on the reasonable and prudent operator rule, not a breach of a fiduciary duty. The award of $4,055,000 is reversed. In addition, the breach of the implied contractual duty is a legal remedy and an award for constructive fraud and for disgorgement is unavailable because the legal

remedy for breach is an adequate remedy. With any other result, remedies for breaches of contract would be swallowed by equitable claims such as this one for constructive fraud and disgorgement. The judgment against H & P for $119,522,750 is reversed.

¶ 44 The third reason for granting certiorari was that the Court of Civil Appeals had affirmed a mathematically impossible jury verdict on the plaintiffs' constructive fraud claim. As we have reversed the judgment based on equity, this third reason for granting certiorari is answered. However, within that question is an implication that the maximum possible recovery was $2,683,982. Our affirmed judgment is on the implied covenant to prevent drainage. It is not limited to a percentage of what H & P has characterized as the $17.2 million take-or-pay settlement.

¶ 45 The fourth reason for granting certiorari was that the Court of Civil Appeals had affirmed the constructive fraud damage award notwithstanding that no fraud claim was ever certified. Having reversed the constructive fraud damage award, we hold that this issue is moot.

¶ 46 This trial court found that costs, interest, and attorney fees were due. The court should revisit that order to determine these items in a manner consistent with this opinion. If the court finds that prejudgment interest is due pursuant to a judgment for a breach of the implied duty in an oil and gas lease to protect against drainage, the court is directed to determine and award the appropriate interest rate or rates.

CERTIORARI PREVIOUSLY GRANTED; OPINION OF THE COURT OF CIVIL APPEALS VACATED; JUDGMENT OF THE DISTRICT COURT AFFIRMED IN PART AND REVERSED IN PART; REMANDED TO DISTRICT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.

CONCUR: REIF, V.C.J., KAUGER, WINCHESTER, TAYLOR, COMBS, JJ.

CONCUR IN PART; DISSENT IN PART: COLBERT, C.J. and WATT, J.

DISQUALIFIED: EDMONDSON and GURICH, JJ.

WATT, J. concurring in part and dissenting in part.

¶ 1 I concur in the majority opinion's treatment of *Roye Realty & Developing, Inc. v. Watson,* 2 P.3d 320 (Okl.1996) [republished at 2 P.3d 320]. However, because I agree with the Court of Civil Appeal's handling of the constructive fraud issue, I dissent to the majority's departure therefrom.